*In re* MARRIAGE OF PATRICIA SIECK, Petitioner-Appellant, and EKKEHARD SIECK, Respondent-Appellee.

First District (2nd Division)    Nos. 78-296, 78-887 cons.

Opinion filed October 30, 1979.

Arthur Rosenblum, of Chicago, for appellant.

Kirsh, Nadler & Berman, Ltd., of Chicago (Arthur M. Berman and J. Scott Bonner, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:
In a child-custody proceeding following marital dissolution Ekkehard Sieck, the father (hereinafter respondent), was awarded sole

custody of the two children born of the marriage. The mother, Patricia Sieck[1] (hereinafter petitioner), appeals, seeking reversal of the custody order. She raises two principal issues, namely, whether the award of custody to respondent was against the manifest weight of the evidence; and hearsay was properly admitted over timely objection.

Petitioner and respondent were married on October 18, 1969. Their son, Darren M., was born November 11, 1973, and their daughter, Jessica M., was born September 30, 1974. On December 26, 1975, the parties separated, petitioner leaving the marital home in Elk Grove Village with the children to live with Ken Wyant and his parents. On January 7, 1976, petitioner sued to dissolve the marriage on the grounds of mental cruelty and on that date was awarded temporary custody of the children, which she maintained until the permanent custody hearing. In an amended petition, she charged respondent with desertion and adultery. Judgment for dissolution of the marriage was entered on January 5, 1978, expressly reserving questions of maintenance, child support, child custody and property rights for further hearing. The custody order, entered February 9, 1978, found that both parents were fit and proper persons to have care, custody and control of the minor children. In contemplation of the relevant factors set forth in section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602), however, custody was awarded to respondent in the best interests of the children.

At the custody hearing petitioner testified on her own behalf. She and respondent moved into the marital residence in July of 1970. Because respondent told her to get out, she and the children moved out on December 26, 1975, moving in with Kathleen and Kenneth Wyant (then living) in Elk Grove Village where they stayed for two weeks. Thereafter they moved into her grandmother's house in Brookfield where they stayed until the beginning of March 1976. They then moved into an apartment in Itasca where they resided for six months, returning to the marital home on September (later corrected to August) 1, 1976, where they resided since. No one else lived there with them. Darren attended nursery school in Niles, Illinois, two days per week. Jessica was too young to attend school. Petitioner took the children to a pediatrician on a regular basis for childhood diseases and complaints. Darren was one month prematurely born and Jessica three months. She was kept in a high-risk intensive care nursery where she spent two months before being released from the hospital. During the time of their marriage, respondent spent very little

---

[1] Appellant states in her brief that since the judgment for dissolution of marriage was entered, she and Kenneth Wyant had married and are presently living together as man and wife.

time with the children or at home; when at home he recognized petitioner and the children for short periods of time and thereafter watched television. Respondent administered either very severe punishment as discipline for the children or none at all.

Under cross-examination petitioner testified that she placed Darren in the nursery school in Niles, the village in which Wyant later lived with his parents, because schools in other suburbs were unavailable, although she did not check any other suburb. Darren received a bump on his head after having fallen from his tricycle in April 1975 and was kept overnight at a hospital.

Respondent, under section 60 (Ill. Rev. Stat. 1977, ch. 110, par. 60) examination, testified that he owned a beauty shop in Park Ridge situated in a building in which there was another business office and a three-room apartment, where he lived alone. The apartment contained a living room, kitchen, bedroom and bath, and could accommodate the residence of both children. During the periods of visitation with his children while in custody of petitioner, his friend, Jenny Lee, was present on occasion. He found the children reasonably well dressed, in clean clothes with occasional colds and normal children's illnesses. On one occasion he took Jessica to a doctor for examination because she had a bad cold and a lump on her forehead. He never saw his wife abuse the children since their separation. Aside from seeing a medical doctor, he had himself consulted with a friend who was a psychologist because of problems occasioned by the separation. His children were normal, were happy to see him, and got along well with him. He never observed how they got along with their mother; however, they told him that they did not get along with her.

Petitioner's father, Ray A. Lokay, who resided in Allentown, Pennsylvania, testified that he visited the Siecks' marital home from the inception of their marriage on an average of twice per month and spoke with his daughter on an average of three or four times per week. When he observed respondent together with the children, they were ignored by him for the most part, whereas his daughter was a loving, kind mother, interested in the welfare of the children. The environment in the home between the mother and children was excellent and the living ac-commodations more than adequate. The children were receiving religious training. Darren has a good personality, was very outgoing and was a happy child. Jessica was articulate, very bright and loving both to her mother and her grandparents. Both children were very stable. On cross-examination, Lokay testified that in addition to calling his daughter at the marital home, he also reached her at another daughter's home or at the Wyant home.

Richard L. Marks, M.D., specializing in pediatrics, testified for

petitioner. He saw the Sieck children for routine care. Darren was seen about 15 times in the previous four years which included visits for immunizations, illnesses and for the purpose of determining whether or not there was any evidence of child abuse; he found no such evidence. He also saw Jessica on 15 or 20 occasions just after her release from the hospital, also for immunizations, childhood diseases and similar complaints. On the occasions that he saw the Sieck children, he made recommendations to the mother which she followed. On cross-examination he testified that he did not know whether the children were taken to see some other doctor or hospitalized without his knowledge. He did not know where the children lived although he knew that the mother changed addresses. He did not consider the number of visits made by the children to see him unusual or unnecessary. He regarded the complaints of both children to have been within the realm of "normal."

Margaret Kohler, petitioner's sister, was called on her behalf. She testified that she lived in the same household with petitioner and her children in April of 1976 and again in September of that year. On the first occasion she lived with petitioner in Elk Grove Village and thereafter in her own residence in Carpentersville and then in Woodstock. They stayed together for at least a week or longer and spent many weekends together. She thereafter moved to Pennsylvania where she has lived for about one year. She came to visit the previous summer for a period of two weeks, in September 1977. She and petitioner communicated by telephone every couple of weeks. The children appeared to have been in very good health and got along very well with their mother. Jessica was extremely attached to petitioner and showed a great affection for and trust in her. Darren had the same affectionate personality as his sister and a great attachment for his mother. Petitioner conducted herself very well toward the children and gave them a structured type of day including necessary discipline which sometimes resulted in a spanking. On the occasions where she had seen respondent in the family setting before the separation and divorce, he did not seem to show a lot of interest in the children or talk to them when he came home from work. On cross-examination she stated that she had been able to reach her sister by telephone at Wyant's house, but did not know the number of times. Wyant was a friend of hers.

Dr. Jack Arbit, licensed to practice in the State of Illinois, was called by respondent. He received bachelor's, master's and doctorate degrees from the University of Illinois, the latter two in psychology, and was a professor in the department of neurology and in the department of psychiatry at Northwestern University Medical School. He was a lecturer at the Loyola Medical School. He was the director of the psychological testing program at Northwestern Memorial Hospital and the director of the behavioral neurology program at Loyola Hospital. Petitioner's counsel

stipulated that he was an expert in psychology. He had made between 600 and 700 evaluations of children ages seven years and under and had previously testified in court cases.

Dr. Arbit evaluated Darren and Jessica, who were first submitted to a series of psychological tests conducted by another hospital psychologist and were thereafter subjected to his own psychological testing on April 25, 1977, when they were brought to him by respondent. He interviewed each child first separately and then together with the father. The tests administered were a Stanford-Binet Intelligence Scale, a Peabody Picture-Vocabulary Test and a Michigan Picture Story Test. After the tests were administered to the children, he carried out a diagnostic clinical evaluation. The testing took between 9 a.m. and noon to complete.

Based upon his examination of Darren, Dr. Arbit concluded that he was a frightened youngster who was overwhelmed by the relationships he had with the figure he identified as mother, becoming extremely distraught and distressed in attempting to deal with it. The child showed significant developmental and neurotic disturbances, which, in his opinion, could be causatively localized to a significant extent in the relationship with the mother. Other things being equal, he believed the family of the father would be more acceptable psychologically and most helpful therapeutically for Darren. In October 1977 he again evaluated Darren following essentially the same procedures except for the intellectual testing but added another personality test called the Blackie Test. He again saw the youngster feeling overwhelmed by difficulties in dealing with a mother image that he identified as very possessive and demanding in a pattern that seemed an extension of what had been noted at the first testing. The second evaluation showed a continuing progressive and increasing distress in the youngster but qualitatively no different than at the first session. The discomforting, distressing, disquieting, anxiety-producing figure to Darren was the mother. His opinion, that other things being equal, the child would be better off with the father, did not change.

Dr. Arbit saw Jessica first on the same morning of April 25, 1977, and followed similar procedures in evaluating her as were used in evaluating Darren except for omitting some tasks because of her younger age, notably the Michigan Picture Tests. The primary result most noticeable psychologically was the significant difficulty Jessica had in viewing herself as a young girl and as a potential woman, not necessarily in the sexual sense, but in terms of nonsexual structures. She seemed distressed about having to identify herself as a young woman and potential adult female. In his opinion there were developing some insipient qualities relating to a depressive process with a negative self-concept and with some failure at identification that would have established herself in her own mind

psychologically as a young woman. The features he noted in the sense of disturbances were related to mother-daughter relationships. He concluded that the best interests of the child would be in living with the father. He again saw Jessica in October of 1977 and administered the Blackie Test which resulted in findings very similar to his earlier conclusions with what now seemed to be a more progressive depressive development related to the mother. He would recommend that both children receive the professional help of a child psychologist or psychiatrist.

Dr. Arbit spoke with Jenny Lee a month after his initial examination of the children, and before his last examination, for the purpose of interviewing someone aside from the children's parents who might have information, awareness, feelings or thoughts which might supplement the initial evaluation that he made. His opinion was no different after the contact than it was following his own testing.

On cross-examination Dr. Arbit revealed that he took no formal personal history of the father but was aware that there was a divorce or custody matter pending and learned subsequently that he was going with Jenny Lee, whom he knew was under psychiatric care. He also took no formal history of Jenny Lee, whose name he received from the respondent's attorney. He completed the children's evaluation and report independently from the interview he had with Miss Lee. The term "other things being equal" meant that one parent is not psychologically sicker than the other and that economically, socially, culturally and experientially, they would have had the same background. He did not recommend to respondent or his counsel at the time the last test results were completed that the children should see a child psychologist or psychiatrist and did not know if he ever made such a recommendation.

Petitioner, called as an adverse witness under section 60, testified that she moved back into the marital residence on August 1, 1976, and lived in no other residence since that time. She stayed with the Wyants for about two weeks and then lived with her grandmother until March 1, 1976, in Brookfield, and thereafter moved into an apartment in Itasca for about six months. For two periods, early in April 1976 and again in August of 1976, she lived with her sister in Woodstock. Ken Wyant lived with his parents in their home in Niles. She had stayed overnight at that residence on more than one occasion, for holidays, in observances for birthdays, for family get-togethers, and when harassment got bad. She denied living in the marital home only on Sundays in order to give possession of the children to respondent when he came to pick them up. From the time the children were born until the separation, she went out of the house in the evenings without her husband on occasion, leaving the children in his care, or taking them with her. She visited often with a friend, Carol Zilenski;

either Carol was always in her house or she was in the Zilenski house. She denied asking Zilenski to let her use the apartment so that she could be alone with a man other than her husband and never used that apartment with another man, particularly in October and November, 1975. The lease for her apartment in Itasca was signed both by herself and Ken Wyant.

Respondent, called as a witness on his own behalf, testified that if he received custody of the children he would take an apartment large enough to accommodate his children and his mother, who would come from Germany to help with them. From the time the children were born until the separation he babysat more than 40 times and more than once per week in most instances. On a number of occasions petitioner would leave at 7 or 8 p.m. and return around midnight and sometimes later, once at 4 a.m. on the following day. On each occasion petitioner stated that she had been with her girlfriend, Carol Zilenski. When he visited the children and took them with him, they told him every week that they did not want to go back and did not like their mother. They complained that they were not happy.

On cross-examination respondent testified that his mother was 61 years of age and speaks some English. As a self-employed beautician he took his first appointment at 8:30 a.m. and his last one at 4:30 p.m. from Wednesday through Saturday except for Thursday nights when he worked until 6:30. He may have told his wife that small children frightened him. He did not pay the rent on Jenny Lee's apartment. His children never slept overnight in Miss Lee's apartment. He consulted with a psychologist in October of 1974 and again in late December 1975. The purpose of the 1974 visit was to discuss with the psychologist, a close personal friend, his financial problems occasioned by Jessica's premature birth and resultant very large, uninsured medical bills. The December 1975 visit was occasioned by being distraught because of the separation. He believed that he was emotionally qualified to care for his children and give them necessary stability as well as parental love.

Carol Zilenski, called on behalf of respondent, testified that she had known petitioner since age 18 and had known the parties during the course of their marriage. On the occasions during the marriage that she saw respondent with the children, she observed what appeared to be a normal father-child relationship. During the months of October, November and December, 1975, petitioner came to her apartment on six occasions in order to meet Wyant. Petitioner told her she was very interested in having some private time together with him and asked to use the Zilenski apartment for that purpose, which she in fact used. Petitioner told her that she and Wyant had a physical relationship and were very close to one another. On cross-examination the witness denied ever having dated respondent and had no physical relationship with him either

before 1975 or after. She was single and had never been married. Respondent had never been in her apartment and she had never been in his. She had never been in respondent's shop and was never employed by him. Wyant was the husband of a woman who was petitioner's best friend in 1975. The children were happy when they were with petitioner, who cared for them and kept them clean.

Marjorie Schnell, who had been the next door neighbor of the Siecks for seven years, was called on behalf of respondent. Her townhouse had one wall in common with that owned by the Siecks. She testified that from the summer of 1976 to the summer of 1977 petitioner did not live in the marital home, based upon her observations. With two children, there are usually children's noises in the house; cars can be seen coming and going; a certain amount of other noise comes through the walls. The children were observed playing outside during that period of time only on weekends, not during the week. People were observed going in and out of the house also only on weekends. From the summer of 1977 until the time of trial, petitioner and the children were still not living in the next door home, based upon the previously mentioned indicia. She noticed no lights on in the evenings. On Sundays, she saw a white convertible coming early in the morning and leaving at around 11 a.m. Respondent always seemed to be a loving father and played with his children, giving them attention. She was a very close friend of the family and saw them frequently during the period of marriage.

Jenny Lee, inamorata and former customer of respondent's, testified on his behalf. She and he got together because of their children, she having been given custody of her five-year-old son following a divorce, in a relationship that began in December 1975. The children got along very well together and were involved in a variety of activities. Over petitioner's objection, she testified that the Sieck children told her they did not like their mother and hated her. They told her that she slapped them in the face, pulled their hair, kicked them and rarely let them go out of doors. One of the children told her that "Mommy was sleeping with Kenny." They also made statements to the effect that they did not like Kenny; he hit and spanked them and threatened to lock them and their mother in a cage. The children and their father got along very well together. She had seen the respondent spank the children as a disciplinary measure. When it was time for the children to return home after visiting, they got very upset, cried, screamed, hid under furniture and respondent had to physically drag them out. Under cross-examination she stated respondent had always been present when the Sieck children visited with her. She had sex relations with respondent in her apartment since 1976. She had seen a psychologist once per week for about one year to work out some of her marriage problems that existed in 1974.

Ernest Rizzo, a licensed private investigator, testified on behalf of respondent. He performed 1500 to 2000 investigations in matrimonial matters over the last eleven years. He was employed by respondent on three occasions. In April of 1976 he was requested to ascertain the identity of the person respondent's wife was living with and where, which required surveillance of petitioner's apartment in Itasca for eight days from April 6 through April 17, 1976. Surveillance began at about 4 p.m. on each occasion. He observed petitioner pull up to the apartment complex in a white convertible with a male subject later identified as Ken Wyant and saw both enter the apartment through the rear. At 10:30 p.m. all lights in the apartment were turned off. He knew that the two subjects were still in the apartment by virtue of having applied surgical tapes to the door. At 4 a.m., the tapes were still intact. This was done at approximately the same times with the same results on each occasion. He was also able to see Wyant physically because the apartment was only nine or 10 feet above ground level.

A few months later respondent asked Rizzo to verify whether petitioner was living in the marital home following her having secured a court order requiring him to vacate those premises. For the next 2½ weeks, starting August 1, 1976, he began surveillance at approximately 7:30 or 8 a.m. At 8:30 or 8:45 a.m. he observed petitioner and Wyant, together with the two children, park the same white convertible previously seen in Itasca in the driveway of the home, and enter. About 45 minutes later he observed respondent arrive, take the two children, go back to his car with them and leave. Ten minutes later he saw petitioner and Wyant leave the house, enter their car and also depart. Surgical tape was applied to the front and back doors of the townhouse which were maintained and inspected during the course of the day until 5 p.m. when he saw the same car bearing petitioner and Wyant pulling into the driveway. Within 30 to 45 minutes, respondent brought the children home and turned them over to petitioner. He left after a few minutes. Five minutes later, petitioner, the two children and Wyant came out of the house, got in the car and he observed them go to an address on Merrill Street in Niles. Thereafter he returned to the marital home, reapplied surgical tape and checked it four or five times in the course of the next week, finding it always to be intact. The following Sunday at approximately the same times as on the previous Sunday, a similar series of events took place as on the previous Sunday described. On June 2, 1977, a Thursday, he maintained surveillance at the Merrill Street address in Niles. At 5:45 p.m., petitioner was identified at the front door with her two children. One-half hour later he observed Wyant. Petitioner, the children and Wyant remained in the house. At 10:55 p.m., all the lights in the house were turned off. At 2:15 a.m., the surveillance was concluded and commenced anew at 6 p.m. the following

day with similar results, as did a further surveillance occurring on June 4, 1977. On cross-examination Rizzo testified that he was convicted in the Federal court of illegal electronic surveillance, from which an appeal was pending.

After reciting and analyzing certain evidence from the record of testimony taken before him, and the law which he understood should be applied, the trial judge awarded custody of both children to respondent, from which petitioner prosecutes this appeal.

Petitioner's first contention is that the award of custody to respondent was an abuse of discretion, against the manifest weight of the evidence, and contrary to law because the evidence demonstrates that she was an excellent mother, had good rapport with the children, kept a well-ordered, clean home, followed a regular schedule for meals, naps, bedtimes and religious training for the children and established good communications with them. Relying upon *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300, petitioner asserts that the children, being of tender years, should be living with her rather than with their father. She notes that even in cases where a mother is guilty of misconduct, including adultery; or living with a man not her husband, as long as there is no evidence of adverse effect upon the future welfare of the children, the courts will not punish a mother for past misconduct or the children by denying them a mother's care but will award custody to the mother, citing *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 166 N.E.2d 111; *Brown v. Brown* (1957), 13 Ill. App. 2d 56, 140 N.E.2d 528 (abstract); *Van Buskirk v. Van Buskirk* (1974), 19 Ill. App. 3d 647, 312 N.E.2d 395 (abstract); *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647; *Jarrett v. Jarrett* (1978), 64 Ill. App. 3d 932, 382 N.E.2d 12;[2] *Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 364 N.E.2d 566; and *Christensen v. Christensen* (1975), 31 Ill. App. 3d 1041, 335 N.E.2d 581. Petitioner argues that under the foregoing cases the trial court was precluded from considering the relationship between petitioner and Wyant, or the movement from time to time of petitioner and the children from place to place because there was no showing of any adverse effect on the welfare of the children. Further, she maintains, the testimony of the psychologist, Dr. Jack Arbit, was clearly without foundation or basis. Having found her a fit and proper person to have custody, petitioner urges that the broad discretion possessed by the trial court in custody matters was abused and its findings and conclusions were, as a matter of law, clearly erroneous, requiring that custody of the children be returned to her. We cannot agree.

■■ ■ The proposition for which petitioner cites *Nye v. Nye*, that in a contest of custody of a child of tender years, a mother must be preferred,

---

[2] *Jarrett v. Jarrett* was taken by the supreme court on leave to appeal and oral argument was heard September 26, 1979.

has been the subject of a number of other cases decided by the appellate courts in recent years. We find most of the courts which have considered this question more recently concluding that as a result of ongoing social and legal trends, the presumption previously recognized in custody cases favoring the mother is no longer valid. (*Pratt v. Pratt* (1975), 29 Ill. App. 3d 214, 330 N.E.2d 244; *Anagnostopoulos v. Anagnostopoulos* (1974), 22 Ill. App. 3d 479, 317 N.E.2d 681; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 320 N.E.2d 581; *King v. Vancil* (1975), 34 Ill. App. 3d 831, 341 N.E.2d 65; *Gren v. Gren* (1978), 59 Ill. App. 3d 624, 375 N.E.2d 999; and *In re Marriage of Farris* (1979), 69 Ill. App. 3d 1042, 388 N.E.2d 232.) Representative of this approach is the opinion in *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 406-07, 320 N.E.2d 581, in which the court stated:

> "The legal principles involved in judicial determination of custody of children are in themselves necessarily simple. By the very nature of these situations, each one is different and only the most general principles exist for the guidance of the trial and reviewing courts. It must be the sole objective of the court 'to reach a decision designed to protect the child's best interests.' (*Patton v. Armstrong*, 16 Ill. App. 3d 881, 882, 883, 307 N.E.2d 178.) The custody of the child should be awarded to any person only where such action is 'consistent with the welfare and best interests of the child.' *People ex rel. Morris v. Morris*, 44 Ill. 2d 66, 68, 254 N.E.2d 478, and additional cases there cited.
> 　＊　＊　＊
> In reviewing orders bearing upon child custody, it is also the duty of this court to give constant and unswerving attention to the best interests of the child. ＊ ＊ ＊
> As a final cautionary matter, it should be noted that there is today no inflexible rule which requires that custody of children, especially of tender age, be vested in the mother. Equality of the sexes has entered this field. The fact that a mother is fit is only one facet of the situation and, standing by itself, it does not authorize a denial of custody to the father, when this appears necessary because of other considerations. *Braun v. Goodman*, 3 Ill. App. 3d 1002, 1005, 279 N.E.2d 177; *Carlson v. Carlson*, 80 Ill. App. 2d 251, 255, 225 N.E.2d 130; Ill. Const. (1970), art. I, §18."

We believe that the *Marcus* opinion well states the rules which must be followed by the trial and reviewing courts in custody matters. We direct our inquiry next into the question of wherein lay the best interests of the Sieck children in light of the record established in this case under the foregoing rules.

　No support appears in the record for the proposition submitted by petitioner that custody was awarded to respondent because of the sexual

relationship that existed between herself and Wyant. The trial court referred to this testimony in assaying the credibility of petitioner, particularly with respect to the maintenance of environmental stability for the children as it affected their welfare and best interests. Evidence of petitioner and the children moving from place to place, particularly the continuing movement on a weekly basis over a period of time from the alleged marital domicile was of considerable importance. (See *Holloway v. Holloway* (1973), 10 Ill. App. 3d 662, 294 N.E.2d 759; *Kjellesvik v. Shannon* (1976), 41 Ill. App. 3d 674, 335 N.E.2d 120; and *De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 384 N.E.2d 997.) Petitioner maintained she lived there continuously, whereas evidence in the record amply supports the trial judge's conviction that she actually maintained residence at the home of Wyant and his parents in Niles, using the children to sustain the appearance of residence at the former, by shunting them back and forth from one place to another. From these facts the trial judge concluded that petitioner's conduct created an improper setting in which to raise two minor children, requiring them to reside in a strange home, neither the home of the mother nor the father. The trial judge also considered petitioner's sexual relationship with Wyant from the standpoint of her willingness, based upon evidence in the record, to spend considerable periods of time away from the children during late evening and early morning hours in the months of November and December 1975, which demonstrated to the court a deficient attitude of this parent toward the welfare of the children. Noting that respondent was involved in a sexual relationship of his own with Jenny Lee, the court concluded that such conduct nevertheless was outside the immediate concern and direct involvement with the children, in contrast with petitioner's *modus operandi*. When considered together with other temporary residences established by petitioner for the children in Brookfield with her grandmother, in Woodstock with her sister, in the Itasca apartment and in the Niles home of the Wyants, we find no abuse of discretion in the trial court's conclusion that petitioner had failed to maintain the necessary stability of environment for the children, particularly in view of respondent's ability and willingness to do so.

■■ Petitioner insists that the testimony of the psychologist, Dr. Arbit, should have been ignored and that his findings and conclusions fail to support the trial court's reliance upon this evidence. We note that no countervailing evidence was submitted on behalf of petitioner. The testimony of the psychologist, of course, is not determinative of the issue of custody, yet it may be properly considered with respect to whatever illumination it may provide to the court in identifying the best interests of the children. The role of such expert testimony was explicated in *Marcus v. Marcus*, wherein the court stated (24 Ill. App. 3d 401, 406):

"Furthermore, in this situation, as in other cases in which expert opinions are used by the court, no harm is done by the expression of expert opinion bearing directly upon the ultimate issues. The trial court 'is not required to accept the opinion of the expert * * *.' (*Merchants National Bank v. Elgin, J. & E. Ry. Co.*, 49 Ill. 2d 118, 122, 273 N.E.2d 809.) Thus, in a case involving custody of a child, this court has held that receiving the opinion of a psychiatrist 'would not usurp the decision-making function of the court.' *Filipello v. Filipello*, 130 Ill. App. 2d 1089, 1095, 268 N.E.2d 478."

The inquiry as to mental and physical health of the individuals involved was thus properly pursued here and was sanctioned as well by statute (Ill. Rev. Stat. 1977, ch. 40, par. 602(a)(5)). The testimony elicited from Dr. Arbit revealed somewhat extensive testing on two separate occasions for each child. Nothing in the record suggests the invalidity of any of the tests given or the conclusions drawn from the results thereof. Petitioner's appellation of the findings and conclusions of the psychologist as "mumbo-jumbo," "gibberish," "ridiculous," "mystical" and "psychological jargon," while lending literary pungence to the articulation of legal argument in her brief, does not fill the evidentiary void which might have supported those conclusions in the record.

■■ ■ Petitioner next argues that the trial court should have independently ordered psychiatric tests of both parents in accordance with sections 604(a), (b) and section 605 of the Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1977, ch. 40, pars. 604(a), (b); 605.) The language of the statutes is permissive in providing that "the court may seek the advice of professional personnel," and "the court may order an investigation and report," not mandatory. Furthermore, the record reveals no instance in which either parent requested that such examinations be undertaken. Had such requests been timely made, the evidence now found lacking could have been developed and the court given the benefit of what petitioner now deems essential. We find no abuse of discretion in the trial court's failure to require such psychiatric investigation under these circumstances. Nor do we find persuasive petitioner's argument in her reply brief that the trial judge erred in having failed to interview the children. The statute in this respect is also cast in permissive, rather than mandatory, language (Ill. Rev. Stat. 1977, ch. 40, par. 604(a)). As in the instance of the omitted psychiatric interview, no suggestion or request was made by either party to the effect that such an interview would have been necessary, or even helpful. No abuse of discretion can be assigned to this circumstance, particularly in consideration of the very young years of the children.

■■ Finally, petitioner asserts that the trial court erred in allowing the

psychologist to testify as to what the children allegedly told Jenny Lee and in allowing Jenny Lee to testify as to what the children allegedly told her about their relationship to the mother because those statements were hearsay and influenced the trial court's decision. She contends that none of the exceptions to the hearsay rule would permit the court to admit such statements or to consider them in arriving at its conclusion. The record reveals that no direct testimony was given by Dr. Arbit with respect to any statements made to him by Jenny Lee. His interview with her did not affect his initial or subsequent evaluations of the children but were undertaken, according to the witness, "* * * not to make a diagnosis of the children * * * but simply to ascertain for myself whether or not the feelings and opinions and impressions I had seemed reasonable on the basis of some additional information." No reference was made by the trial court to any testimony by Dr. Arbit that included extrajudicial statements which may have been made to him by Jenny Lee. With respect to the statements made by the children to Jenny Lee concerning their mother and Wyant, the record shows that they were not offered to prove the truth of those statements, but rather as evidence of the children's state of mind and emotional state. No error is found in the court's receiving such testimony. See, *e.g.*, *De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 764, 384 N.E.2d 997; *Quick v. Michigan Millers Mutual Insurance Co.* (1969), 112 Ill. App. 2d 314, 250 N.E.2d 819.

■■ The evidence presented in this case was conflicting. The trial judge had ample opportunity to observe both parents, the witnesses and the children and was in the best position to assess and evaluate their testimony. We cannot disturb his determination in this type of case unless it results in manifest injustice or is against the manifest weight of the evidence. (*Roth v. Roth* (1977), 52 Ill. App. 3d 220, 225, 367 N.E.2d 442; *Sorenson v. Sorenson* (1973), 10 Ill. App. 3d 980, 982, 295 N.E.2d 347; *Windhorn v. Windhorn* (1970), 131 Ill. App. 2d 785, 790, 264 N.E.2d 531.) On this record, we find in the decision neither abuse of discretion, manifest injustice, nor contraposition to the manifest weight of the evidence.

For the above and foregoing reasons we are not justified in reversing or changing the order of custody and must, accordingly, affirm.

Affirmed.

DOWNING and PERLIN, JJ., concur.