Rule 23 order filed
September 16, 2009;
Motion to publish granted
October 15, 2009.

NO. 5-08-0657

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* BRANDON A., a Minor | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Franklin County. |
| | ) |
|    Petitioner-Appellee and Cross-Appellant, | ) |
| | ) No. 05-JA-40 |
| v. | ) |
| | ) |
| Timothy A., | ) Honorable |
| | ) E. Kyle Vantrease, |
|    Respondent-Appellant and Cross-Appellee). | ) Judge, presiding. |

_____

PRESIDING JUSTICE WEXSTTEN delivered the opinion of the court:

Timothy A., the respondent, appeals from the circuit court's order terminating his parental rights to his minor son, Brandon A., on its findings that the respondent's repeated incarceration has prevented him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2006)) and that the termination was in the minor's best interests (705 ILCS 405/2-29(2) (West 2006)). The State cross-appeals from the court's finding that the respondent is not depraved (750 ILCS 50/1(D)(i) (West 2006)). For the reasons that follow, we affirm.

BACKGROUND

Brandon was born in December 1998. In January 2005, his mother, Patsy, died of a drug overdose, and his father, the respondent, was arrested and incarcerated on drug charges. Brandon's maternal grandmother, Shirley Rice, immediately assumed custody of him, and in November 2005, the State filed a petition for an adjudication of wardship on his behalf (705 ILCS 405/2-13 (West 2004)).

1

In December 2005, at the first hearing on the State's petition for an adjudication of wardship, the trial court expressed concern that the respondent had not been served with a summons. In response, the State informed the court that it had learned where the respondent was being housed by the Illinois Department of Corrections (DOC) and would serve him prior to the next hearing. By the agreement of the parties present, the court placed Brandon in the temporary custody of the Department of Children and Family Services (DCFS). DCFS then deemed Shirley "a relative foster parent," and Brandon was permitted to remain in her care. The respondent was later served with a copy of the petition for the adjudication of wardship, a notice of rights, and notices of hearings. The court subsequently entered additional temporary custody orders continuing temporary custody with DCFS.

In February 2006, the cause proceeded to an adjudicatory hearing. The court noted that the respondent had been served with a summons but was not present. Joe Frey of DCFS testified that, although Shirley had "quickly and appropriately" assumed custody of Brandon following Patsy's death and the respondent's incarceration, she "still did not have the legal authority to make decisions on his behalf." Thereafter, the court adjudicated Brandon a dependent minor pursuant to section 2-4(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-4(1)(a) (West 2004)) and set the cause for a dispositional hearing. The respondent subsequently retained counsel and filed a writ to be present at the dispositional hearing.

In June 2006, the cause proceeded to a dispositional hearing, where the respondent was present with counsel. Frey testified that DCFS had placed Brandon in Shirley's care and that she had been cooperative with DCFS ever since. Frey stated that it would be in Brandon's best interests to remain in foster care with Shirley. The respondent testified that, although he and Brandon had "always been close," he was unable to take care of Brandon because he was incarcerated. The respondent referred to Shirley as a "wonderful

2

grandmother" who loved Brandon, and he stated that under Shirley's care is "where [Brandon] should be."  At the conclusion of the hearing, the court found that it was in Brandon's best interests that he be made a ward of the court.  The court granted custody and guardianship to DCFS and ordered DCFS to arrange visitation with the respondent.

In June 2007, the cause proceeded to a permanency hearing.  Faith Johnson of Lutheran Social Services (LSS) testified that referrals with respect to many of the components of the respondent's service plan could not be made because of his incarceration.  She further testified that Brandon was doing very well under Shirley's care and was well-behaved and well-adjusted.  Johnson opined that given Brandon's "desperate need for permanency," the appropriate permanency goal "would be substitute care pending termination of parental rights."  The respondent testified that he expected to be released on parole from DOC in January 2008.  He acknowledged that there were federal drug charges still pending against him, but he insisted that he was not guilty of those charges.  He indicated that he sincerely loved Brandon, that he had improved himself while in prison, and that, once released, he was willing to do whatever was necessary to regain custody of his son.  Noting that Brandon had already been in foster care for approximately 2½ years, the trial court agreed with LSS's recommendation and found that the appropriate permanency goal was substitute care pending a determination on the termination of parental rights.  The court also ordered that visitation between the respondent and the minor be continued.

In November 2007, the State filed a motion for the termination of parental rights and for the appointment of a guardian with the power to consent to an adoption.  In its motion, the State alleged that the respondent was unfit for the following reasons: (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility for Brandon's welfare (750 ILCS 50/1(D)(b) (West 2006)), (2) he had failed to protect Brandon from environmental conditions that were injurious to Brandon's welfare (750 ILCS 50/1(D)(g) (West 2006)), (3)

3

he had failed to make reasonable efforts to correct the conditions that were the basis of Brandon's removal (750 ILCS 50/1(D)(m)(i) (West 2006)), (4) he had failed to make reasonable progress towards Brandon's return within nine months after Brandon had been adjudicated a dependent minor (750 ILCS 50/1(D)(m)(ii) (West 2006)), (5) he was depraved in that he had been criminally convicted of at least three felonies and at least one of his convictions had taken place within five years of the filing of the motion to terminate parental rights (750 ILCS 50/1(D)(i) (West 2006)), and (6) he was incarcerated at the time of the filing of the motion to terminate parental rights, he has been repeatedly incarcerated as a result of criminal convictions, and his repeated incarceration has prevented him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2006)).

In April 2008, the respondent filed a motion to dismiss the State's motion for the termination of parental rights. Citing section 2-13(4.5)(a) of the Act (705 ILCS 405/2-13(4.5)(a) (West 2006)), the respondent maintained that the State was not statutorily authorized to commence the termination action because Brandon was being cared for by a relative. Following a hearing on the matter, the trial court denied the respondent's motion to dismiss.

In June 2008, the cause proceeded to a fitness hearing, at which the following evidence was adduced. In April 2003, when Brandon was four, the respondent pled guilty to a charge of felony driving while license revoked and was sentenced to one year in prison. Including jail time, the respondent was incarcerated approximately six months on the conviction. In September 2004, DCFS first became involved with Brandon when it investigated a drug-related risk-of-harm report with respect to Patsy. In January 2005, Patsy died of a drug overdose; the respondent, who was suspected of providing the drugs that killed Patsy, was arrested on drug charges; and Shirley assumed custody of Brandon. In June 2005, the respondent pled guilty to the State's drug charges against him, and in August 2005, he

4

was sentenced to seven years in DOC. While in prison, the respondent "sent money to Brandon for school supplies and things like that" but was unable to otherwise support him financially. In January 2008, the respondent was paroled from DOC but was immediately taken into custody by federal agents on a warrant stemming from his federal drug charges. Since his arrest on the federal warrant, he had been incarcerated at the Jefferson County jail. The respondent testified that he believed that the sentencing range on his federal charges was 5 to 40 years' imprisonment but that he was eligible to receive credit for his time spent in DOC. He indicated that he was presently working on a plea agreement and hoped to be out of federal prison by 2011. He acknowledged that he could not "parent" Brandon while incarcerated.

In August 2008, the trial court entered a written order finding that the respondent was unfit due to his repeated incarceration. The court found that the State had failed to prove its other allegations of unfitness. With respect to the repeated-incarceration ground, the court stated the following:

"In this case, [the respondent] was incarcerated for six months when Brandon was four years old. [The respondent] has been incarcerated since January 7, 2005, when Brandon was six years old[,] and will not be released from custody until at least 2011. Brandon will turn thirteen years old at the end of that year. [The respondent] could remain in custody after 2011 ***. During this time of incarceration, [the respondent] is not able to provide 'the necessary emotional and financial support and stability required of a parent.' The Court finds that the State has proven by clear and convincing evidence that [the respondent] was incarcerated at the time of filing the motion for termination of parental rights, [that] he has been repeatedly incarcerated as a result of criminal convictions, and [that] his repeated incarceration has prevented him from discharging his parental responsibilities."

In October 2008, the cause proceeded to a best-interests hearing. Sarah Viernum of LSS testified that she had been counseling Brandon since the summer of 2005. When Viernum first saw Brandon, he was experiencing difficulties dealing with the loss of his mother and was exhibiting regressive behaviors such as bed-wetting, tantrum-throwing, and talking like a baby. After a year of counseling, Brandon's behavior improved but was still inconsistent. Viernum testified that her main goal was to help Brandon develop coping skills because it was very difficult for him to not know what was ultimately going to happen to him. She observed one visit that Brandon had with the respondent, and she stated that, although Brandon "seemed to be excited to see his father ***[,] he didn't really know what to say or what to do." She noted that Brandon had later told her that he did not like visiting the respondent when they had to "talk through a phone and through glass" and that Brandon had "made comments that he didn't really care if he visited or not." She also opined that Brandon did not have a typical father-son attachment to the respondent and that he needed "a stable, structured environment that he knows he can count on." Viernum believed that Brandon's improvements were the result of his being "in the same place for such a long time" and that he could regress in the future in the absence of stability because he did not know what could happen at any given time.

Millie Deadmond of LSS testified that she was Brandon's caseworker and that the last attempted visit between Brandon and the respondent had occurred two weeks before the best-interests hearing. When Deadmond spoke to Brandon prior to the scheduled visit, he told her that he "hated his father and did not want to visit anymore." Although she encouraged him to attend the visit, he still refused. Deadmond testified that Brandon had also refused to attend the visit before that and had stated that he never wanted to see the respondent again. Brandon's last visit with the respondent was a "through-the-glass visit," and Brandon "left 20 minutes early." Deadmond testified that Shirley's home was an appropriate environment

6

for Brandon and that he had his own room and a playroom. Brandon was doing well in school and had been discharged from speech therapy. He had maternal aunts, uncles, and cousins in the area and had made friends with children in the neighborhood.

Shirley testified that she resided with Brandon in her home in Johnston City and that she had been taking care of him since January 2005. She stated that Brandon, who was almost 10, was doing well in school and that she checked his homework nightly. She indicated that Brandon was also doing well in counseling and that the behavioral problems he exhibited during their first year together had subsided. She testified that she wanted to adopt Brandon and had the means to support him. She stated that Brandon does his chores and that his best friend lives down the street. Shirley testified that she was 57, was in very good health, and had never been convicted of a crime. She indicated that Brandon was excited about the prospect of her adopting him and that he was very happy in her home. She stated that, when Brandon started school in Johnston City, he "told everyone his name was Brandon Rice."

On the respondent's behalf, Tamara Mayberry of LSS testified that, during the summer of 2007, Brandon was always excited to visit the respondent at the Shawnee Correctional Center. Mayberry stated that, during the visits at the correctional center, the respondent was pleasant and "very involved with Brandon." In her opinion, Brandon and the respondent had "wonderful visit[s]," and the respondent "seemed like a great dad."

Frey testified that he supervised one visit between Brandon and the respondent at the Vienna Correctional Center. During the visit, the respondent's behavior was appropriate, and there was some bonding. When cross-examined, however, Frey stated that "Brandon's been in limbo for half his life" and that it would be in Brandon's best interests to have a "permanent living environment and a permanent bond with a caretaker."

The respondent's mother, Pamela Hailey, testified that, when she took Brandon to visit

7

the respondent at the Vienna Correctional Center, it was obvious that Brandon loved him. She further testified that Shirley and Deadmond had attempted to alienate Brandon from the respondent. She acknowledged that, since she had recently moved to Texas, she would be unable to have much contact with Brandon, even if the respondent's parental rights were not terminated.

The respondent testified that, while in prison, he had taken numerous classes to improve himself. He testified that he loved Brandon very much and wanted to remain a part of his life. He expressed his willingness to do whatever was necessary to spend as much time with Brandon as possible following his release from prison. He stated that, although the sentencing range on his federal charges was 10 to 14 years, he was going to receive sentence reductions for his cooperation and for his time spent in DOC. He stated that under a "best case scenario" he would be released from federal custody in 6 to 9 months and that under a "worst case scenario" he would be released in 2 to 2½ years. He claimed that, upon his release from prison, he was going to work for his brother for $70,000 a year. He further claimed that Shirley had provided Patsy with prescription drugs while she was alive and that Brandon would lack a positive male role model under her care.

In its closing argument, the State noted that, while the respondent was undoubtedly going to be incarcerated "for some time in the future," how long he would be incarcerated was unknown. Stating that "[t]his has been lingering on for years," the State maintained that Brandon needed permanency in his life. The State asked the court to terminate the respondent's parental rights so that Brandon could move on. Suggesting that the present case was not a difficult one and arguing that "Brandon deserves permanency," Brandon's guardian *ad litem* also urged the court to terminate the respondent's parental rights.

Counsel for the respondent argued, *inter alia*, that Brandon would still be young when the respondent is released from prison. Counsel noted that the respondent clearly loved

Brandon and wanted to "be there for him." Counsel suggested that Shirley hated the respondent because she blamed him for Patsy's death.

In November 2008, the trial court entered a written order terminating the respondent's parental rights to Brandon and appointing DCFS as his guardian with the power to consent to an adoption. After noting that it had previously found that the respondent was unfit due to his repeated incarceration, the court stated the following:

"Brandon has been in the care and custody of his maternal grandmother, Shirley Rice, since his mother's death in January 2005. In December of this year, Brandon will be ten years old. In January, he will have spent four years living with his grandmother. Throughout that time, [the respondent] has been incarcerated. [He] remains in the custody of the United States Government. The date of his scheduled release from custody is unknown. For the past four years, Brandon's only contact with his father has been correspondence and visits at a county jail or an Illinois state correctional facility. While those visits were appropriate, according to witnesses, they were limited by the requirements of the facility where [the respondent] was incarcerated. Since [the respondent] has been in the custody of the [United States Government], the visits have been 'no contact' visits, apparently through glass. At least one witness testified that during the visits in the summer of 2007, [the respondent] was trying to get to know his son.

Brandon has become attached to his grandmother and has a sense of belonging. He does not appear to be attached to his father and recently has refused to visit with him. Brandon is in need of permanency, to know with whom he will be living and by whom he will be cared for. To a ten[-]year[-]old child, four years seems like an eternity. It is still not known when [the respondent] will be released from custody. At the fitness hearing, he testified that the best case scenario was that he might be

9

released in 2011. [At the best-interests hearing], he claimed he may be released in 2009, although there was no evidence to support that claim. Even if he were released from custody, there is no assurance that [he] would be in any position to care for his son."

The respondent subsequently filed a timely notice of appeal.

## ANALYSIS

The respondent raises numerous issues on appeal, and as previously noted, the State raises one issue on cross-appeal. We will address each in turn.

### The Validity of the Trial Court's Temporary Custody Orders

The respondent first complains that, because he had not been given adequate notice of the proceedings at which temporary custody was granted to and continued with DCFS, the trial court's temporary custody orders were invalid. We agree with the State, however, that the respondent has waived the consideration of this issue by raising it for the first time on appeal. See *Fawcett v. Reinertsen*, 131 Ill. 2d 380, 386 (1989). We further agree with the State's observations that the trial court complied with the statutory requirements attendant to temporary custody orders entered *ex parte* (see 705 ILCS 405/2-10(3) (West 2004)), that the respondent never sought a rehearing on any of the court's temporary orders (see 705 ILCS 405/2-10(4) (West 2004)), and that the issue is ultimately moot (see *In re D.S.*, 217 Ill. 2d 306, 320 (2005); *In re A.D.W.*, 278 Ill. App. 3d 476, 480 (1996)).

### The Validity of the Trial Court's Termination Order

Referencing section 2-13(4.5)(a) of the Act (705 ILCS 405/2-13(4.5)(a) (West 2006)), the respondent contends that the trial court's order terminating his parental rights is invalid because the State was not authorized to commence the termination action. The State counters that the respondent's argument misreads section 2-13(4.5)(a) and is "totally without support."

In relevant part, section 2-13(4.5)(a) provides as follows:

"With respect to any minors committed to its care pursuant to this Act, the Department of Children and Family Services shall request the State's Attorney to file a petition or motion for termination of parental rights and appointment of guardian of the person with power to consent to adoption of the minor under Section 2-29 if:

(i) a minor has been in foster care, as described in subsection (b), for 15 months of the most recent 22 months ***

* * *

unless:

(i) the child is being cared for by a relative[.]"  705 ILCS 405/2-13(4.5)(a) (West 2006).

The respondent maintains that, because Brandon was being cared for by a relative the entire time he was in foster care, the State was not authorized under section 2-13(4.5)(a) to file its motion for the termination of parental rights.  As the trial court noted when rejecting this argument, however, section 2-13(4.5)(a) does not limit the State's power to commence a termination proceeding; it rather mandates that DCFS request that the State commence that proceeding under certain circumstances.  Moreover, as the trial court further noted, the State may commence proceedings on a motion to terminate parental rights any time after the entry of a dispositional order.  See 705 ILCS 405/2-13(4) (West 2006).  While issues of statutory construction are reviewed *de novo* (*Hennings v. Chandler*, 229 Ill. 2d 18, 24 (2008)), "[w]e cannot read words into a statute that are not there" (*Chicago Tribune Co. v. Board of Education of the City of Chicago*, 332 Ill. App. 3d 60, 67 (2002)).  Accordingly, we reject the respondent's proposed interpretation of section 2-13(4.5)(a).

### The Respondent's 1997 Criminal Conviction in Mississippi

At the fitness hearing, as proof of a prior felony conviction, the State produced a

certified copy of an order from the circuit court of Prentiss County, Mississippi, stating that, in June 1997, the respondent pled guilty to a charge of "[s]ale of crack cocaine within 1500' of [a] church." The order further stated that the respondent received a 15-year prison sentence on the charge with "credit for time served and the remainder of [the] sentence *** suspended." On appeal, the respondent contends that the court should not have considered the evidence of this 1997 conviction as proof of a felony conviction. He argues that the conviction should not be deemed a felony conviction because he was given a "deferred sentence." We agree with the State, however, that not only is this claim without merit but it is also immaterial.

As the trial court determined below, "based upon a review of the Mississippi statutes," the respondent's 1997 conviction was a conviction for a felony offense, regardless of the fact that the "remainder" of the 15-year sentence had been "suspended." See Miss. Code Ann. §§41-29-139, 41-29-142 (1996). As the State observes on appeal, given the length of the sentence that the respondent received, the offense underlying the conviction had to be a felony because it could not have been a misdemeanor. See *Conner v. State*, 98-KM-01650-SCT (¶7) (Miss. 2000) ("A misdemeanor, by definition, is 'a criminal offense punishable by a maximum possible sentence of confinement for one year or less, fine, or both.' Uniform Circuit and County Court Rule 6.01"); *Anderson v. State*, 2002-KA-01586-COA (¶22) (Miss. App. 2004) ("There are only two broad categories of crimes according to the gravity of the offense, felonies and misdemeanors"). Ultimately, however, whether the respondent's 1997 conviction constituted a felony conviction is immaterial because the trial court's termination order indicates that it only considered the evidence of the conviction when evaluating one of the State's allegations that the court found the State had failed to prove, *i.e.*, that the respondent was depraved in that he had been criminally convicted of at least three felonies and at least one of his convictions had taken place within five years of the filing of the

12

motion to terminate parental rights (750 ILCS 50/1(D)(i) (West 2006)). The court's order indicates that, when evaluating the sole allegation that the court found the State had proven, *i.e.*, that the respondent's repeated incarceration had prevented him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2006)), it did not consider the 1997 conviction. Thus, even if we were to conclude that the respondent's 1997 conviction should not have been considered a felony conviction, we would conclude that the error was harmless. See *People v. Nitz*, 219 Ill. 2d 400, 410 (2006) (noting that an error is harmless where "the result would have been the same absent the error").

The Respondent's Service Plans

At the fitness hearing, the State produced copies of service plans that DCFS had prepared for the respondent, and the trial court admitted the plans into evidence over the respondent's hearsay objections. On appeal, the respondent contends that the plans were erroneously admitted. As the State argues, however, service plans are admissible pursuant to section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 2006)), which sets forth a statutory "variation of the common-law 'business records' exception to the hearsay rule." *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999).

"The admission of evidence is within the sound discretion of the trial court, and its ruling will be declared erroneous only where there is 'a clear showing of abuse of that discretion.'" *People v. Alsup*, 373 Ill. App. 3d 745, 755 (2007) (quoting *People v. Ward*, 101 Ill. 2d 443, 456 (1984)). Here, proper foundations for the service plans' admission were laid, and the trial court did not abuse its discretion in admitting the plans into evidence over the respondent's objections. Moreover, when finding the respondent unfit, the trial court only referred to the service plans when evaluating allegations that it determined the State had not proven. Thus, even if we were to conclude that evidence of the plans was improperly admitted, we would conclude that the error was harmless. See *Nitz*, 219 Ill. 2d at 410.

13

Viernum's and Deadmond's Testimony

At the best-interests hearing, the respondent objected to portions of Viernum's and Deadmond's testimony on hearsay grounds and further objected to Viernum's testimony on the grounds that the State had failed to disclose certain reports from her counseling sessions with Brandon and that she was an unqualified expert. The trial court overruled these objections, and on appeal, the respondent contends that the court's rulings were erroneous. We disagree.

As with the admission of evidence (see *Alsup*, 373 Ill. App. 3d at 755), "[w]hether a witness is sufficiently qualified to testify as an expert is a matter committed to the sound discretion of the trial court[,] whose determination on the issue may be reversed only if it constitutes a clear abuse of that discretion" (*In re Beatriz S.*, 267 Ill. App. 3d 496, 499 (1994)). Here, Viernum testified that she had worked for LSS for more than two years but had been Brandon's counselor for more than three years, having first seen him while she was employed at another social service agency. She indicated that she counseled Brandon weekly. She further testified that she is a licensed clinical counselor, and she obtained a master's degree in counseling in 1999. Given these qualifications, the trial court rightfully allowed Viernum to testify as an expert competent to offer insight into Brandon's behaviors and needs, and under the circumstances, the court would have abused its discretion had it precluded her from doing so. See *In re Beatriz S.*, 267 Ill. App. 3d at 499-500. As for the State's failure to disclose all of Viernum's reports regarding her counseling sessions with Brandon, she stated at the hearing that she did not have access to her records from the social service agency where she had worked prior to joining LSS. Noting that the records' unavailability explained why the State had not produced them, the court intimated that there was good cause to excuse the State's failure to disclose (see 166 Ill. 2d R. 213(g)), and we find no abuse of its discretion. We also note that the trial court referred to Viernum's

14

testimony regarding her first-year sessions with Brandon as "background information." With respect to the respondent's assertion that portions of Viernum's and Deadmond's testimony constituted erroneously admitted hearsay, that claim is belied by the record.

"Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted[] and is generally inadmissible unless it falls within a recognized exception." *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). "However, an out-of-court statement not offered for the truth of the matter asserted is not hearsay." *People v. Malave*, 230 Ill. App. 3d 556, 560 (1992).

Here, when overruling the respondent's hearsay objections, the trial court confirmed that the State was "not attempting to prove that whatever the child related actually occurred," and then the court indicated that it was admitting the testimony in question as evidence of Brandon's "state of mind" and as foundational evidence for the basis of Viernum's opinions. The rule prohibiting the admission of hearsay evidence is not implicated where the testimony in question is offered as evidence of a child's "state of mind and emotional state" (*In re Marriage of Sieck*, 78 Ill. App. 3d 204, 218 (1979)), and "[t]he rule is not implicated *** where statements otherwise inadmissible as hearsay are used by experts for the purpose of explaining the bases for their opinions" (*People v. Leach*, 391 Ill. App. 3d 161, 173 (2009)). Accordingly, the trial court did not err in overruling the respondent's hearsay objections.

The Trial Court's Dependency Finding

The respondent argues that, because Brandon was constantly being cared for by a known relative, the trial court erred in adjudicating him a dependent minor. Noting that although Shirley had "physical custody" of Brandon, she lacked the legal authority to make decisions on his behalf, the State maintains that the respondent's argument incorrectly assumes that "if a child is staying with a relative[,] he can never be dependent." We agree with the State.

15

"At an adjudicatory hearing, a trial court must determine whether a minor is abused, neglected, or dependent." *In re C.M.*, 351 Ill. App. 3d 913, 916 (2004). "Dependency need only be established by a preponderance of the evidence," and "[a] trial court's determination regarding dependency will not be overturned unless it is manifestly erroneous." *In re J.J.*, 246 Ill. App. 3d 143, 151 (1993).

Here, the court adjudicated Brandon a dependent minor pursuant to section 2-4(1)(a) of the Act (705 ILCS 405/2-4(1)(a) (West 2004)). Section 2-4(1)(a) allows for a finding that a minor is "dependent" if he is "without a parent, guardian[,] or legal custodian." 705 ILCS 405/2-4(1)(a) (West 2004). In January 2005, Patsy died, and the respondent was arrested and incarcerated on drug charges. At that point, Brandon was left without a parent or legal guardian to care for him. The trial court's finding that Brandon was a dependent minor was therefore "fully supported" by the facts before it. *In re A.D.W.*, 278 Ill. App. 3d 476, 482 (1996) (affirming the trial court's finding of dependency where the "evidence showed that both [of the minor's parents] were incarcerated at the time of the hearing").

The Trial Court's Unfitness Finding

The respondent next challenges the propriety of the trial court's finding that he was unfit. As previously noted, although the State alleged that the respondent was unfit on six statutory grounds, the trial court found that the State had proven only one ground, *i.e.*, that his repeated incarceration has prevented him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2006)).

"Because termination of parental rights is a serious matter, the State must prove unfitness by clear and convincing evidence." *In re Richard H.*, 376 Ill. App. 3d 162, 164-65 (2007). The grounds that will support a finding of unfitness are found in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2006)), and although section 1(D) sets forth numerous grounds on which a parent may be deemed unfit, an unfitness finding may be

16

entered if there is sufficient evidence to satisfy any one ground. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006).

As a reviewing court, we accord the trial court's finding of parental unfitness great deference because it is in the best position to make factual findings and credibility assessments. *In re D.L.*, 326 Ill. App. 3d 262, 269 (2001). Furthermore, we will reverse the trial court's decision regarding parental fitness only if it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001). "A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result." *In re D.D.*, 196 Ill. 2d at 417.

Section 1(D)(s) allows for a finding of parental unfitness under the following circumstances:

"The child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2006).

Section 1(D)(s) recognizes that, despite a respondent's demonstrated interest in his child's welfare, a child needs permanency in a stable home with a positive, caring role model. See *In re M.P.*, 324 Ill. App. 3d 686, 693 (2001). "Section 1(D)(s), no doubt, is applicable in situations where the parent, during the lifetime of the child, has had recurring absences caused by incarcerations which have prevented the parent from providing his or her child with a stable home environment." *In re D.D.*, 196 Ill. 2d 405, 420 (2001).

Here, at the time of the fitness hearing, the respondent had been incarcerated for nearly half of Brandon's life and was further expected to remain incarcerated for at least

17

another three years. As the trial court indicated in its order finding the respondent unfit, his "repeated incarcerations have prevented him from providing [Brandon] with the necessary emotional and financial support and stability required of a parent." See *In re M.P.*, 324 Ill. App. 3d 686, 693 (2001). The State proved the existence of the conditions set forth in section 1(D)(s) by clear and convincing evidence (see *In re M.P.*, 324 Ill. App. 3d at 693), and we cannot conclude that the trial court's finding that the respondent is unfit because his repeated incarceration has prevented him from discharging his parental responsibilities was against the manifest weight of the evidence (see *In re M.M.J.*, 313 Ill. App. 3d 352, 355 (2000)). We also take judicial notice of the fact that the respondent is not scheduled to be released from federal prison until June 2022, at which time Brandon will be 23 years old. See *People v. Young*, 355 Ill. App. 3d 317, 321 n.1 (2005); http://www.bop.gov/iloc2/LocateInmate.jsp (visited August 25, 2009).

The Trial Court's Best-Interests Finding

The respondent lastly challenges the trial court's finding that terminating his parental rights was in Brandon's best interests. The State maintains that it presented "more than sufficient evidence" to sustain the trial court's determination, and we agree.

The goals of a proceeding to terminate parental rights are as follows: "(1) to determine whether the natural parents are unfit[] and if so (2) to determine whether adoption will best serve the child's needs." *In re M.M.*, 156 Ill. 2d 53, 61 (1993). "Once parental unfitness has been found in a proceeding to terminate parental rights, the parent's rights must yield to the best interests of the child." *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002). To determine the child's best interests, the trial court is required to consider the following factors in the context of the child's age and developmental needs:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

18

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence[,] which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2006).

Other important considerations include the nature and length of the child's relationship with his present caretakers and the effect that a change of placement would have upon the emotional and psychological well-being of the child. *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). The State must prove, by a preponderance of the evidence, that the termination of parental rights is in the child's best interests (*In re D.W.*, 214 Ill. 2d 289, 315 (2005)), and "[t]he court's best-interest finding will not be reversed unless it is against the manifest weight

of the evidence." *In re Veronica J.*, 371 Ill. App. 3d 822, 831-32 (2007).

The evidence presented at the best-interests hearing established that Shirley has provided Brandon with an appropriate home for many years. He has become attached to her and is doing well socially and academically under her care. He continues to improve through counseling and is no longer required to attend speech therapy. Shirley testified that she wanted to adopt Brandon and had the means to support him.

Brandon has had little opportunity to attach to the respondent because of the respondent's repeated incarceration. Moreover, if the respondent is not scheduled to be released from federal prison until Brandon is 23 years old, he will never be able to meaningfully father or care for Brandon during his minority. We also note that Frey and Viernum both opined that Brandon needed a stable home environment with a permanent caretaker, which is what he now has with Shirley. Viernum also believed that Brandon's improvements were the result of his being "in the same place for such a long time" and that he could regress in the future in the absence of stability. Under the circumstances, we cannot conclude that the trial court's determination that it was in Brandon's best interests to terminate the respondent's parental rights and to appoint DCFS as the guardian with the power to consent to an adoption was against the manifest weight of the evidence.

### The State's Cross-Appeal

The State cross-appeals from the trial court's determination that the respondent successfully rebutted the statutory presumption that he is depraved in light of his felony convictions (see 750 ILCS 50/1(D)(i) (West 2006)). Because we have already determined that the trial court's finding that the respondent is unfit pursuant to section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2006)) was not against the manifest weight of the evidence, it is unnecessary to address the State's argument. "[A] finding of unfitness on any one ground obviates the need to review other statutory grounds." *In re J.J.*, 307 Ill. App. 3d

71, 76 (1999).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

CHAPMAN and STEWART, JJ., concur.

NO. 5-08-0657

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* BRANDON A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Franklin County. |
| | ) | |
| Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | No. 05-JA-40 |
| v. | ) | |
| | ) | |
| Timothy A., | ) | Honorable |
| | ) | E. Kyle Vantrease, |
| Respondent-Appellant and Cross-Appellee). | ) | Judge, presiding. |

**Rule 23 Order Filed:** September 16, 2009
**Motion to Publish Granted:** October 15, 2009
**Opinion Filed:** October 15, 2009

**Justices:** Honorable James M. Wexstten, P.J.,

Honorable Melissa A. Chapman, J., and
Honorable Bruce D. Stewart, J.,
Concur

**Attorney for Appellant** Paula Newcomb, 503 Public Square, P.O. Box 753, Benton, IL 62812

**Attorneys for Appellee** Hon. Tom Dinn, State's Attorney, Franklin County Courthouse, 202 West Main, Benton, IL 62812; Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Sharon Shanahan, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864