NOTICE

Decision filed 11/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210182-U

NOS. 5-21-0182, 5-21-0183 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* E.M. and A.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jefferson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 18-JA-12, 18-JA-13 |
| | ) | |
| Amy A.-M., | ) | Honorable |
| | ) | Evan L. Owens, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

ORDER

¶ 1    *Held*: The trial court's orders finding that Amy A.-M. was an unfit parent were not contrary to the manifest weight of the evidence, and we affirm the orders. The trial court's orders concluding that the best interest of the minor children was served by termination of Amy A.-M.'s parental rights were not manifestly erroneous, and we affirm the orders.

¶ 2    Amy A.-M. appeals from the trial court's orders finding that she was an unfit parent and that her parental rights should be terminated. On appeal, she argues that these orders are erroneous. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    E.M. is a female child born on July 16, 2011. A.M. is a female child born on October 10, 2012. Amy A.-M. is the mother of both children. Ryan M. is the father of both children. This

1

appeal was filed by Amy alone. Ryan will be referenced throughout this order because the cases were combined in the trial court and because Ryan's progress and efforts are an integral component of the trial court's orders finding that Amy was an unfit parent and that her parental rights must be terminated.

¶ 5    Amy had a history of involvement with the Department of Children and Family Services (DCFS), and in 2008, a female child was removed from her care due to allegations of prescription drug misuse and mental health issues. On November 29, 2010, Amy surrendered her parental rights to that child.

¶ 6    This case began on August 9, 2017, when Amy contacted DCFS to ask for assistance. She informed DCFS that she, Ryan, and the two children were homeless. The family was living in their vehicle in Centralia. DCFS opened an intact family services case for Amy and the family. At some point after the intact family case was opened, Amy and the children moved into Lifeboat Alliance, a homeless shelter in Mt. Vernon.

¶ 7    On February 8, 2018, Amy was asked to leave Lifeboat Alliance because of substance abuse issues. She admitted to a Lifeboat Alliance staff member that she would not pass a drug test on February 7, 2018. Amy tested positive for opiates. She did not have a valid prescription for any opiate. A search by Lifeboat Alliance staff located prescription bottles for Lyrica (a nerve pain medication), naproxen (a nonsteroidal anti-inflammatory), and other drugs—none of which were prescriptions in her name.

¶ 8    The State filed its petition for adjudication of wardship on February 13, 2018, regarding E.M. and A.M. The State alleged that the minor children were neglected in that they were in an environment injurious to their welfare because Amy was then homeless, continued to struggle with substance abuse issues, and had not made substantial progress in her intact family services case

2

due to lack of cooperation. Amy refused to comply with counseling services, and she did not complete a housing application. The State alleged that Ryan had two pending criminal cases in Marion County including a charge for domestic battery in which Amy was the victim. In addition, there was a no contact order entered between Amy and Ryan. Ryan had also been charged with three felony counts including harassment of, communication with, and intimidation of a witness. Ryan also did not have stable and appropriate housing. At that time, he was living in a motel but had been homeless in the past. The State alleged that it was in the best interest of the minors to be made wards of the court.

¶ 9    The shelter care hearing was held on February 13, 2018. Both Amy and Ryan agreed to the temporary order that made E.M. and A.M. wards of the court.

¶ 10    The adjudicatory hearing was held on April 30, 2018. Both Amy and Ryan agreed to the order adjudicating the children as neglected because the children were in an environment injurious to their health and welfare. Amy stipulated that she was then unable to provide a stable and appropriate home environment. Ryan stipulated that he had pending misdemeanor and felony charges. On that same date, Amy and Ryan stipulated to the dispositional order. Amy and Ryan were found to be unable to care for their children and to have not made substantial progress with their service plans.

¶ 11    DCFS filed a status report with the court on June 18, 2018, in advance of the status hearing. DCFS labeled E.M. and A.M. as being in a high-risk age group. When Amy tested positive for opiates, she was the sole caregiver for the children. At that time, Amy was receiving intact family services and was not making adequate progress. She refused counseling despite having a history of mental health issues. A care provider reported that Amy was neither cooperative nor motivated to make changes. E.M., who was then six years old, and A.M., who was then five years old, were

3

not potty-trained. DCFS noted that the lack of potty-training skills reflected Amy's inability to meet minimum parenting standards for the children.

¶ 12    Amy met with DCFS on June 13, 2018, to review her service plan. Amy had been regularly participating in parenting classes since May 2018 and the agency reported that she was making progress. She had also been participating in group therapy. DCFS referred Amy for individual therapy and housing services. Amy had regular visits with her daughters and DCFS noted that the visits were going well. A care worker was scheduled to begin participating in Amy's visits with her children.

¶ 13    On August 2, 2018, DCFS filed its status report with the court. Amy was continuing with counseling services. She was also attending dialectical behavioral therapy groups and had "graduated" to attending individual therapy sessions. Amy continued to work with Family Foundations in its parenting program and was making progress. Amy was consistent with her visits with her children. She was also working with DCFS providers on housing. Despite her progress on services, Amy was still homeless and was staying with various friends in the Centralia area. She also was unemployed and DCFS noted that she either needed to obtain employment or disability benefits.

¶ 14    At the court's August 6, 2018, status hearing, the court requested that DCFS increase the mother's visits with the children to two per week. The court set the permanency hearing for October 22, 2018.

¶ 15    On October 22, 2018, DCFS filed its permanency hearing report with the court. At that time, Amy continued to be unemployed and homeless. DCFS noted that Amy "continues to deal with mental health issues that significantly interferes with her ability to function in her daily life." Amy was inconsistent with drug screens and had missed four of eight drug tests. The four that she

4

took were negative. DCFS indicated that Amy had not made satisfactory progress or reasonable efforts toward the goal of reunification with her children. Amy continued to receive mental health and other related therapies. She completed the Family Foundations parenting program. DCFS planned to apply for funding to assist Amy with housing but could not do so until she obtained employment as the funding was dependent upon Amy having a source of income to sustain the housing expenses on her own. Both children were doing well in their Murphysboro foster placement and in school. Amy was consistent with twice weekly supervised visits with the children but struggled with providing discipline and was asked to be more mindful of the snacks and meals she brought for the children because of dietary needs. DCFS listed the following service plan tasks for Amy:

> 1. Cooperate with DCFS;
>
> 2. Improve her level of functioning by achieving an appropriate level of understanding of mental illness and how this affects parenting and relationships;
>
> 3. Utilize positive methods of providing age-appropriate discipline with her children;
>
> 4. Achieve and maintain an alcohol and drug-free existence; and
>
> 5. Provide a safe, adequate, and clean housing arrangement.

DCFS recommended a permanency goal of returning the children home within 12 months.

¶ 16    The trial court entered its permanency order on October 22, 2018, adopting DCFS's permanency goal to return the children home to Amy within 12 months. The court found that Amy had made reasonable efforts toward returning the minors home. The court did not find that Amy had made substantial progress toward that same goal. The court maintained custody and guardianship of the children with DCFS.

5

¶ 17    DCFS filed its next status report on December 3, 2018. Amy had resumed her relationship with Ryan despite the trial court's warnings that doing so could jeopardize her own case. Amy continued to participate in mental health services. In early November 2018, she overdosed on her prescription medications, Lamictal and Zyprexa. She was in the intensive care unit in a Centralia hospital for five days, followed by an approximate week in the psychiatric unit. The overdose occurred after she argued with Ryan. Amy tested positive for benzodiazepines and cocaine on her September 17, 2018, and October 15, 2018, drug tests. She did not appear for one scheduled drug test in October 2018 and did not appear for four scheduled drug tests in November 2018. Amy made no progress with obtaining housing and employment or disability benefits. Both children continued to thrive in their foster placement and in school.

¶ 18    DCFS filed its permanency hearing report with the court on January 28, 2019. Amy was rated as not making satisfactory progress or making reasonable efforts toward the reunification goal. She remained unemployed and had begun residing in a Centralia motel room with Ryan. Because of Amy's drug overdose in November 2018, DCFS reworked her service plan tasks. DCFS listed the following service plan tasks that Amy needed to address:

       1. Improve her level of functioning by achieving an appropriate level of understanding of mental illness and how this affects parenting and relationships;

       2. Learn alternative ways to handle stress other than substance abuse;

       3. Provide current consents for release of information between DCFS and service providers;

       4. Participate in an assessment/evaluation and counseling to determine the level of service required to address mental health issues;

5. Cooperate with any recommendations made as a result of the mental health assessment/evaluation;

6. Complete parenting classes;

7. Demonstrate what she learns in parenting classes in an ongoing basis during interactions with her children;

8. Obtain employment or disability benefits and provide documentation to the caseworker;

9. Obtain suitable housing;

10. Inform DCFS of all changes in address, phone number, employment, or household composition within 24 hours;

11. Keep all appointments with DCFS and its caseworkers on scheduled and unscheduled bases;

12. Complete a substance abuse assessment;

13. Cooperate with recommendations resulting from the substance abuse assessment;

14. Submit to random drug tests;

15. Sign paperwork for DCFS to communicate with the substance abuse provider; and

16. Discontinue the use of alcohol, illegal drugs, and nonprescribed medication.

Amy was still consistently engaged in visits. She and the children were bonded to each other. However, DCFS reported that she continued to struggle with discipline and structure, and noted that Amy was "mostly cooperative" with providing appropriate meals and accepting recommendations when suggested. The permanency goal remained the same—to return the children home within 12 months.

¶ 19    On January 28, 2019, the trial court entered an agreed permanency order. The court found that Amy had made reasonable efforts, but not substantial progress, toward returning the children home.

¶ 20    DCFS and Amy participated in a child and family team meeting on March 1, 2019. The purpose of the meeting was to outline and discuss Amy's service plan goals, as well as expectations for completion.

¶ 21    On July 8, 2019, DCFS filed its family service plan with the court. Amy had reportedly made some progress in services and continued to consistently attend her visits with her children. She was still unemployed, but she was receiving Temporary Assistance for Needy Families financial assistance, and she had applied for disability benefits. She and Ryan were living at a Centralia motel. DCFS noted that Amy's mental health continued to be an issue in that she had trouble concentrating and making decisions, had low self-esteem, had a loss of interest in activities, and had issues with overstimulation. She had been diagnosed with bipolar disorder, anxiety, obsessive compulsive disorder, and attention deficit hyperactivity disorder. DCFS rated Amy as satisfactory on the following action steps: parenting classes and use of parenting skills with the children; completing a mental health assessment and appreciating the effects that her mental health issues have on parenting and relationships; completing a substance abuse evaluation and agreement to comply with all recommendations; discontinuing the use of alcohol and drugs; obtaining housing at the Centralia motel; keeping all appointments with DCFS; and providing DCFS with release forms. DCFS rated Amy unsatisfactory on the following action steps: obtaining financial stability; keeping DCFS informed about changes in address; and cooperation with psychological/psychiatric recommendations.

¶ 22    On that same date, DCFS filed its permanency report with the court. In its list of service plan objections for Amy, DCFS added that she must agree to take prescription medication only as prescribed. DCFS noted that Amy's mental health therapist stated that Amy was ready for discharge for anxiety and depression. However, DCFS was concerned with the therapist's assessment because Amy was still taking prescribed psychiatric medications. DCFS went to the Centralia motel for an unscheduled visit. No one answered the door, but it was noted that the worker observed the curtains move, and so presumptively someone was inside but did not answer the door. This case passed legal screening on May 24, 2019, because of the lack of progress on the goals. DCFS stated:

> "Amy continues to be in a relationship with Ryan despite knowing how his lack of progress has greatly affected her ability to have the children returned to her care. Ryan has not adequately addressed his need for domestic violence treatment or mental health services. As a result the conditions that brought the children into care have not been significantly corrected by the parents."

¶ 23    The trial court entered its permanency order on July 8, 2019, finding that Amy had made reasonable efforts, but not substantial progress, toward returning the children home. Custody and guardianship of the children remained with DCFS.

¶ 24    DCFS filed its August 9, 2019, service plan with the court. In the report, DCFS indicated that the case remained open due to Ryan's "overall lack of significant progress and attendance in services." DCFS noted that he had not completed treatment in mental health services, psychiatric services, or domestic violence services. Ryan also did not have a steady source of income. DCFS stated: "Amy continues to participate in her relationship with Ryan *** despite knowing that his lack of progress in services creates a barrier to her ability to have the children returned to her care." Amy remained unemployed and had not been approved for disability benefits despite repeated attempts. She also declined an offer of housing services. DCFS rated Amy as unsatisfactory on the

following action steps: agreement to keep all appointments with DCFS; agreement to notify DCFS of changes in address and other personal information; agreement to demonstrate progress on mental health issues; agreement to be assessed for and complete recommended domestic violence services; agreement to cooperate with any recommendations made resulting from her psychological evaluation; agreement to stop all use of alcohol, illegal drugs, and nonprescribed medications; agreement to submit to random drug testing (she missed a February 13, 2019, test); agreement to obtain a form of financial support; and agreement to provide suitable housing.

¶ 25    On September 12, 2019, DCFS filed its status report with the court. DCFS reported that on August 29, 2019, it completed an unannounced home safety check at the Centralia motel where Amy and Ryan lived. Ryan answered the door but would not let the caseworker immediately inside. Amy then came to the door and DCFS conducted its check. Flooring was missing from around the toilet in the bathroom. DCFS noted no other safety issues. DCFS reported that Amy refused habilitation services that would have assisted her in obtaining employment. DCFS reported that Amy's mental health therapist was concerned about Amy's relationship with Ryan and had asked the caseworker to refrain from discussing the content of Amy's mental health report in Ryan's presence, noting that Amy could face potential safety issues if the information was divulged. Finally, DCFS reported that Amy continued to have issues with substance abuse and required testing.

¶ 26    On December 13, 2019, DCFS filed its permanency report with the court. DCFS reported that it had not been able to conduct a follow-up safety check of the Centralia motel room to determine if the flooring had been fixed in the bathroom. The caseworker went to the motel on October 17, 2019, and observed that both vehicles were there, but no one answered the door. Amy and Ryan continued to have separate visits with the children because Ryan had not begun domestic

10

violence services. DCFS recommended that the permanency goal be changed to substitute care pending termination of parental rights.

¶ 27　On January 23, 2020, the court held its preliminary hearing. Amy and Ryan did not appear. The court concluded that the appropriate permanency goal was substitute care pending determination of termination of parental rights. The court found that Amy had not made reasonable and substantial progress toward returning the children home.

¶ 28　DCFS filed its next service plan with the court on February 10, 2020. DCFS rated Amy as unsatisfactory on the following action steps: agreement to keep all appointments with DCFS; agreement to demonstrate progress on mental health issues; agreement to be assessed for, and complete, recommended domestic violence services; agreement to cooperate with any recommendations made resulting from her psychological evaluation; agreement to stop all use of alcohol, illegal drugs, and nonprescribed medications; agreement to submit to random drug testing; agreement to obtain employment or disability benefits; and agreement to provide suitable housing.

¶ 29　On July 4, 2020, DCFS filed its permanency report with the court. DCFS informed the court that this case passed legal screening in May 2019 and that DCFS legal counsel had informed the Jefferson County State's Attorney's office on August 15, 2019, that DCFS believed that grounds for termination of parental rights existed. Amy informed DCFS that she was going to file for a divorce from Ryan, that Ryan agreed to move out of the Centralia motel that they shared, and that Ryan agreed to provide financial support to her and the children for "at least six months." However, DCFS had received no confirmation that Ryan left the home and/or that either parent filed for divorce. Amy remained unemployed, with Ryan being her only source of financial support. Amy failed to appear for her June 14, 2020, drug test. She did appear for a June 29, 2020, test, which was positive for marijuana. DCFS stated that it had no knowledge of what psychiatric

11

medications, if any, Amy had been prescribed. DCFS stated that the foster parent for E.M. and A.M. was willing to provide permanency for the girls if the care goal changed to adoption.

¶ 30   On July 17, 2020, the State filed its motion to terminate the parental rights of Amy and Ryan. The State alleged that Amy was an unfit person because she had not made reasonable efforts to correct the conditions that were the basis for removal of the children during any nine-month period since the court adjudicated the children as neglected. 750 ILCS 50/1(D)(m)(i) (West 2018). Alternatively, the State alleged that Amy was an unfit person because she had not made reasonable progress toward the return of her children during any nine-month period since the children were adjudicated as neglected. *Id.* § 1(D)(m)(ii). In a supplement to the motion to terminate, the State stated that Amy had not made reasonable progress toward the return of her children during the following nine-month periods: April 31, 2018, through January 31, 2019; October 22, 2018, through July 22, 2019; April 23, 2019, through January 23, 2020; and/or July 8, 2019, through April 8, 2020.

¶ 31   On July 20, 2020, the court held a permanency hearing and entered its permanency order. The court found that the appropriate permanency goal was substitute care pending determination of termination of parental rights. The court stated that Amy had not made reasonable and substantial progress toward returning the children home.

¶ 32   On August 24, 2020, DCFS filed its family service plan with the trial court. DCFS rated Amy unsatisfactory on the following action steps: agreement to keep all appointments with DCFS; agreement to sign all necessary releases of information; agreement to demonstrate progress on mental health issues; agreement to be assessed for, and complete, recommended domestic violence services; agreement to cooperate with any recommendations made resulting from her psychological evaluation; agreement to stop all use of alcohol, illegal drugs, and nonprescribed

medications; agreement to submit to random drug testing; agreement to obtain employment or disability benefits; and agreement to provide suitable housing.

¶ 33    The trial court held a permanency hearing on January 23, 2021. The court noted that Amy was inconsistent with substance abuse services and drug screens. The court stated that she had not made substantial progress but had made some efforts. Overall, the court found that Amy had not made reasonable efforts and substantial progress toward returning the children home.

¶ 34    On March 5, 2021, the trial court held the fitness hearing. Two individuals who worked on these cases testified. K.D. Lynch, an employee of Community Resource Center, testified about her involvement in Ryan's service plan. Stacie Carr, a DCFS caseworker, testified about her involvement with both Amy and Ryan throughout most of the case. Amy also testified. Ryan did not appear at the hearing.

¶ 35    Lynch testified that she is currently a residential coordinator and supervises three homes in Centralia and Vandalia. Before that position, she was a mental health and substance abuse therapist, as well as coordinator of a domestic violence program called Men Challenging Violence (MCV). In that capacity, she treated and worked with Ryan starting in July 2020. Lynch testified that she completed his mental health assessment and enrolled him in services. Ryan was directed to complete 24 weeks of MCV. He was discharged from the program for noncompliance.

¶ 36    Carr testified that she had been the caseworker for Amy and Ryan since April 2018. She testified that the children came into care because of issues of domestic violence and substance abuse. She reviewed Amy's service plan action steps that were primarily related to substance abuse, mental health, domestic violence, and parenting.

¶ 37    Carr testified that in August 2018 she rated Amy's progress on the service plan as unsatisfactory. Carr stated that the next service plan was dated February 10, 2019, and that at that

13

time, Amy "could have been rated satisfactory," but during that review period, Amy had overdosed with prescription medication in a suicide attempt. Amy also tested positive on a drug test in October 2018. Amy had also moved back in with Ryan somewhere in the late summer or in the early fall of 2018. Carr rated Ryan's progress during this period as unsatisfactory. Carr testified that the next service plan review was in August 2019. During that period, Ryan was not following through on his services and was rated unsatisfactory. Both Amy and Ryan failed to appear for drug tests. Carr testified that Amy's progress was mostly satisfactory, but that the primary concern involved her lack of employment, as was housing and her relationship with Ryan. The February 2020 service plan showed no change in Amy's progress. Amy continued to live with Ryan, who had not completed or actively participated in his services. Amy's housing was not independent of Ryan, and she still had no source of income.

¶ 38    Carr testified that she counseled Amy on multiple occasions that "due to Ryan's lack of progress and lack of willingness to cooperate with services, that it impacted her in a way that it would prevent her from getting her children back in her care if we could deem the situation [with Ryan] safe." Carr testified that, at one point, Amy and Ryan talked about divorce, but when Carr explained that it had to be a permanent separation to derive a benefit with their DCFS cases, they decided to remain together.

¶ 39    Carr testified that Amy had completed most of her services, but the impasse on progress was that she had no source of income and no independent housing from Ryan. Additionally, Carr stated that there was another gentleman who was now living with Amy and Ryan, and she had not been able to obtain information about him.

¶ 40    On cross-examination, Carr testified that Amy has never been employed but was attempting to obtain disability benefits because of respiratory and mental health issues. Carr

14

acknowledged that Amy had completed many of her service plan objectives by the end of the first service plan review period. However, despite that progress, DCFS still had behavioral concerns about Amy. Carr testified that these behavioral concerns involved Amy's ability and willingness to protect her children—to choose the best interest of the children over her relationship with Ryan. Carr explained that Amy's completion of her service tasks and her consistent appropriate visits with her children were basically "undone" by her continued relationship with Ryan, who was making virtually no effort on his service plan objectives.

¶ 41    Amy testified that the DCFS case did not start because of a domestic violence situation. Instead, Amy said that she had no financial means to support herself and the children and she was then living in a shelter. She acknowledged that Ryan was criminally charged for a domestic violence incident that involved her. Amy testified that because of the mental health counseling she received, she now had new tools to deal with these situations. To cope, Amy said that she can walk away to let things cool down. Amy testified that she was currently involved with "countless numbers of groups" which have significantly helped her ability to handle stressors.

¶ 42    Amy testified that she was financially dependent upon Ryan. She said that she had filed for disability benefits prior to this DCFS case on the basis that she has chronic obstructive pulmonary disease. She has not been successful in obtaining disability benefits. Amy testified that she could not obtain employment because of the prescription medications she takes, noting that she was terminated from earlier employment because she fell asleep at work. She stated that she had not ruled out becoming employed but to date nothing had "clicked." Amy testified that she was working on certification as a personal assistant through the Illinois Department of Human Services—Rehabilitation Services. This opportunity became available to Amy three or four days prior to the fitness hearing.

15

¶ 43    Amy's attorney asked her why she went back to Ryan when she knew that doing so would prevent her from getting her children back. Amy responded that the only other choice she had would be to go to "places" that she did not feel would be safe for her or the children. Amy explained that her only other housing options were to live with acquaintances whose lifestyles would not be appropriate for her children.

¶ 44    Amy testified that she tried to get Ryan to engage in his services but stated that he was stubborn. She denied that the November 2018 overdose was a failed suicide attempt but acknowledged that she was feeling "down" on that day because of the children.

¶ 45    On cross-examination, Amy said that E.M. was then nine years old, and A.M. was then eight years old. In addition to these two girls, Amy testified that she had three other children. Casey was close to 21 years old and lived in Missouri. Dale was then 19 years old. S. was then 12 years old and had been adopted by another family.[1]

¶ 46    Amy denied that Ryan battered her more than one time. She said that if Ryan became violent again, she would walk away "because [she] can't determine on how he is going to react." Amy acknowledged that her children should not witness domestic violence.

¶ 47    Amy testified that she was aware that Ryan's lack of progress would harm her case, stating: "They said that when it came down to my service plan and his service plan, if I was totally completed with mine and successful[—]if he didn't, it would make me be unsuccessful too."

¶ 48    At the conclusion of the hearing, the trial court found that Ryan was unfit and set the best interest hearing for April 1, 2021. The court took the matter of Amy's fitness under advisement.

---

[1]The record does not contain information about S.'s surname at the time of DCFS involvement or about the identity of S.'s biological father. After Amy surrendered her parental rights, S. was adopted and would presumably have taken a different surname.

¶ 49    On March 15, 2021, the trial court entered its order finding that Amy was unfit, stating the children were removed from her care because of housing and domestic violence/intimidation allegations against Ryan. The court noted that Amy had worked toward her service plan objectives and at times made reasonable efforts, but she never made substantial progress at returning the children home. The court also found that after Amy moved back in with Ryan, she made no reasonable efforts from that date forward. The court stated that Amy made the decision to move into the Centralia motel with Ryan against the recommendations of DCFS, and in doing so, Amy " 'gave up' on the idea of being independent from [Ryan]." The court stated that Ryan had completed no services and was a danger to the children, that the children were no closer to being returned home than they were when the case began, that Amy was homeless without Ryan, and that Ryan's home was not safe for the children because of his presence. In conclusion, the court found that the State had proven by clear and convincing evidence both that Amy made no substantial progress toward the return of the children during any nine-month period and that Amy made no reasonable efforts toward the return of the children between April 23, 2019, and January 23, 2020, and between July 8, 2019, through April 8, 2020.

¶ 50    The trial court held the best interest hearing on April 1, 2021. Amy and Ryan both appeared. DCFS caseworker Stacie Carr testified. Foster parent Sue Beckman testified. Finally, Amy testified.

¶ 51    Carr testified that she had observed the children in their current foster placement. She described the foster mother's home, including the bedrooms of the girls. She testified that the girls had lived with their foster mother for three years. The interactions between the girls and the foster mom have been positive. The girls refer to the foster mother as Grandma Sue. Both girls have done exceptionally well in school. They attend Lutheran Emmanuel, a parochial school, in

17

Murphysboro. Carr testified that she recommended that the girls stay in their foster placement. She stated that she has no concerns about the physical safety of the girls in that setting.

¶ 52 On cross-examination, Carr testified that she visits the children in the foster home once per month. She acknowledged that Amy's visits with the children go well and that the children are bonded with her. Carr testified that there was a clear benefit to have Amy participate in the lives of the girls, and that the foster mother had agreed to maintain a relationship with Amy if the children can be supervised or safe during those visits. Carr stated that the children's relationship with Ryan was not as strong primarily because his participation in visits had been sporadic.

¶ 53 Sue Beckman testified that she had cared for the children for the past three years. Beckman stated that she was currently retired. She first retired in 2013 but then took part-time jobs working as a helper on school buses and then as an aftercare provider at her church. She testified that this year she retired again because she did not feel that she had enough time to work with the girls after school on their homework. Beckman testified that she owned her three-bedroom home and that her income was derived from social security benefits and investments. She testified that she was financially able to provide for herself and the girls. E.M. and A.M. each have their own bedroom. Beckman enrolled the girls in a private school as soon as they were placed with her. There have been no domestic violence issues in her home. Beckman testified that she has a son who lives in Germany and two brothers living in Tennessee and Chicago. E.M. and A.M. have visited with all of Beckman's family members. Beckman testified that she had not directly spoken to the girls about continuing to live with her. Before the Covid-19 pandemic, the girls went to church regularly and participated in gymnastics classes. Beckman testified that she purchased a trampoline for the girls for exercise. She testified that she was willing to continue to provide a home for the girls on a permanent basis.

¶ 54    On cross-examination, Beckman stated that the girls were excited to visit Amy and at times were sad on the drive back home. She testified that she had no doubt that Amy loved her daughters.

¶ 55    Amy testified that she was still having visits with her daughters one hour per week. Before the pandemic, she would see them twice per week for two hours. She said that the decreased time has been a difficult adjustment for her. Amy stated that she had no complaints about Beckman and that she was very good to the girls. She believed that the girls loved Beckman. But Amy testified that she wanted to maintain a presence in their lives, and she was fearful that if Beckman adopted the girls she could cut Amy out. Amy stated that she would prefer that Beckman be named as the legal guardian for the girls. She testified that A.M. always cries at the end of their visits, and so she fears that being completely removed from the lives of her children would emotionally harm them. On cross-examination, Amy testified that she was still living with Ryan.

¶ 56    On April 5, 2021, the trial court made a minute entry terminating the parental rights of Amy and Ryan. The court noted that although it considered the guardianship option urged by Amy, the children needed the permanence that the court could only provide by terminating the rights of their parents. The court noted that Amy loves her children; that Amy and Ryan continued to reside together in the Centralia motel; that Amy and Ryan continued to be in the "same cycle" despite the numerous opportunities provided to them; that the children have lived with Beckman for three years and were thriving and developing; that the children had the best chance for success by staying in Beckman's safe, secure, and adequate home; and that Beckman was committed to the process and was willing to adopt the children. The court stated that based on the totality of the evidence, and after consideration of all statutory best interest factors, termination of parental rights was necessary. On May 13, 2021, the trial court entered its written order terminating the parental rights and appointing a guardian with the power to consent to adoption.

19

¶ 57    Amy appeals from the order finding her an unfit parent and from the order terminating her parental rights.

¶ 58                                    II. ANALYSIS

¶ 59    On appeal, Amy argues that the trial court's orders that she was an unfit parent and that her parental rights should be terminated were erroneous. We disagree.

¶ 60    Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is unfit as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2018); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 61    On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 62    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Amy met any of the alleged definitions of an "unfit person"

contained in the State's motion for termination of parental rights. The trial court determined that the State met its burden of proof that Amy failed to make reasonable progress during any of the nine-month periods, and that Amy failed to make reasonable efforts in two nine-month periods after she reunited with Ryan: April 23, 2019, to January 23, 2020, and July 8, 2019, to April 8, 2020.

¶ 63    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 64    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 65    We review the evidence in this case to determine whether the trial court correctly concluded that Amy did not make reasonable efforts to correct the conditions that resulted in the removal of

21

E.M. and A.M. from the home. Here, the conditions that were the basis for removal of the children from the home began when Amy was told to leave the Lifeboat Alliance shelter because she tested positive for opiates, and she and the children became homeless. DCFS created a service plan for Amy to address the following concerns: psychiatric and psychological treatment, avoidance of substances of abuse, obtaining housing and employment, participation in weekly supervised visitation with her children, and parenting skills. Later, due to Ryan's domestic violence charges, DCFS added domestic violence services to her service plan.

¶ 66    Within the first year, Amy had successfully navigated many of the service plan objectives, and she was very consistent with her weekly visits with the children. However, she still did not have safe housing and did not have any means to support herself and the children.

¶ 67    Although not mentioned by the trial court in its order finding that Amy was an unfit parent, the record on appeal lists numerous positive drug tests. The October 22, 2018, permanency hearing report indicated that Amy had missed four of her eight drug tests. While the four that she took were negative, the four that she failed to take were presumptive positives. Later, in the December 3, 2018, DCFS status report, DCFS reported that Amy tested positive for benzodiazepine and cocaine on her September 17, 2018, and October 15, 2018, tests; did not appear for another test in October 2018; and did not appear for four tests in November 2018. Again, the missed drug tests were presumptive positives. Amy did not take her February 13, 2019, test. Later service plans and status reports detailed Amy's failure to comply with the scheduled drug tests. She tested positive for marijuana on June 29, 2020, after failing to appear for her June 14, 2020, drug test. At the January 23, 2021, permanency hearing, the court stated that Amy was inconsistent with substance abuse testing. From the record, it appears that Amy did not have her substance abuse issues under control, which would provide an unsafe home environment for the children.

22

¶ 68    We also note that Amy never made any progress on obtaining housing or obtaining employment or other means of independent financial support. Amy's attempts to obtain disability benefits began before this DCFS case, and she was repeatedly denied. From Amy's testimony at the fitness hearing, she had not worked for an appreciable amount of time. In September 2019, DCFS reported that Amy rejected services to help her obtain employment. Amy testified that she could not obtain employment because of the prescription medications she took. She testified that no job category "clicked" for her. Finally, about three to four days before the fitness hearing, Amy decided to begin the process to obtain certification as a personal assistant. Amy had the ability to find employment throughout this case but willfully chose to remain unemployed. Remaining unemployed prevented Amy from obtaining financial independence. Failing to obtain financial independence prevented Amy from obtaining suitable housing for her children.

¶ 69    Although Amy did much personal work through the services offered to her by DCFS and made reasonable efforts at the beginning of this case, that status changed when Amy returned to live with her husband, Ryan. From the record, Ryan had no interest in working with DCFS and completing the service plan action steps needed to reunite with his children. Most importantly, he refused to complete the domestic violence program. As domestic violence had occurred in his relationship with Amy, Amy's return to Ryan's home was fraught with safety issues for her and for the children. We also note that Amy's drug overdose in November 2018 occurred after an argument with Ryan, not long after she moved back in with him. Despite numerous warnings by the DCFS caseworker and the trial court that living with Ryan could halt her own progress, Amy chose to remain with him. Her rationale was that if she moved out, she would be homeless again. She stated that if she was homeless, DCFS would not let her have her children. Amy concluded that she might as well continue to live with Ryan because DCFS would not return the children to

her if she lived with Ryan or if she chose to be homeless. Amy's rationale misses the point. Amy's job as a parent was to give priority to her two children. Instead, she chose the man who had abused her instead of her children.

¶ 70    We find that the trial court fully considered the evidence in the record and at the fitness hearing. We conclude that the trial court's finding that Amy was an "unfit person" was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 71    Having determined that the trial court correctly found that Amy was an unfit parent, we turn to the best interest of E.M. and A.M. Termination of a parent's rights is an extreme act. *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). A parent maintains a superior right to raise his or her own children. *Id*. Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010). Until the court determines that a parent is unfit, the interests of both the parent and the child are concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)). After finding that a parent is unfit, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d at 366.

¶ 72    "[A]t a best-interest[ ] hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

24

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 73    In its April 5, 2021, minute entry decision, the trial court did not specifically identify which factors it found important in concluding that the minor children's best interest would be served by termination of Amy's parental rights. However, the court indicated that it had considered all statutory factors. The court is not required to consider each factor individually in determining the

25

best interest of the child. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19; *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004). The trial court may also consider the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170. The court can also consider the length of the child's relationship with his or her foster parents and the emotional and/or physical effect of a change of placement on the well-being of the child. *In re Brandon A.*, 395 Ill. App. 3d 224, 240 (2009) (citing *In re Austin W.*, 214 Ill. 2d 31, 50 (2005)).

¶ 74    On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 75    In this case, the caseworker, the foster mother, and Amy all testified at the best interest hearing. The trial judge was able to watch the witnesses as they testified and to make judgments as to each witness's credibility. The foster mother testified that she would adopt the girls. Although Amy asked the trial court not to terminate her parental rights and to instead order that the foster mother be given guardianship, we agree with the trial court's decision that the children needed, and were entitled to, a more permanent solution. The trial court stated that Amy's love for her children was evident. The foster mother had agreed to maintain Amy's relationship with the children. Although the foster mother would not be obligated to do so after the adoptions were

finalized, DCFS caseworker Carr testified to the foster mother's character and her belief that the foster mother would continue this arrangement.

¶ 76    In this case, the record clearly reflects that termination of Amy's parental rights was the appropriate outcome for E.M. and A.M. By the date of the best interest hearing, the children had been in foster care for over three years. The children were living together with their foster mother. The children were excelling in school. Most importantly, the children were safe. We conclude that the trial court's decision to terminate Amy's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 77                          III. CONCLUSION

¶ 78    For the foregoing reasons, we affirm the judgment of the circuit court of Jefferson County.

¶ 79    Affirmed.