2021 IL App (2d) 210355-U
No. 2-21-0355
Order filed November 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Y.A. & R.B., | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Minors | ) | |
| | ) | Nos. 18-JA-21 |
| | ) | 18-JA-22 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Hawaa A. | ) | Francis Martinez, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court's findings that respondent mother failed to make reasonable progress and that it was in the minors' best interests to terminate her parental rights were not against the manifest weight of the evidence.

¶ 2  Respondent, Hawaa A., appeals from orders of the trial court, which found her unfit and terminated her parental rights. We affirm.

¶ 3                     I. BACKGROUND

¶ 4  Respondent is the mother of the minors at issue in this appeal: her daughter R.B. (born October 2011) and her son, Y.A. (born November 2017). This appeal concerns only respondent's rights over R.B. and Y.A.

¶ 5    In December 2017, the Department of Children and Family Services (DCFS) received a hotline call reporting that R.B. was knocking on the door to an unknown home at around 6:45 p.m. The child was dressed in pajamas and wearing her backpack. R.B. stated that her mother had sent her to her bus stop to "catch" the bus for school. Respondent was located at her home, three blocks away from the bus stop. Respondent appeared to be heavily intoxicated and said that she thought it was the morning. Respondent stated that her son, Y.A., had just been born three months' premature and was in the neonatal intensive care unit (NICU) at Rockford Memorial Hospital. Respondent was arrested and charged with child endangerment.

¶ 6    In January 2018, DCFS received a second call. This time, respondent left Y.A. unattended at the workplace of his putative father, a mechanic's shop; Y.A.'s putative father was not present. Respondent supposedly set down the child's carrier on the floor, leaving him with other workers, and left. Y.A. was taken to Swedish American Hospital and the police and DCFS were called. When respondent appeared at the hospital, she tested positive for alcohol and was "belligerent and uncooperative" with the authorities. When a caseworker asked respondent to identify some family or friends so that they could discuss a potential safety plan, respondent threatened to kill herself if a safety plan were put in place. DCFS then took protective custody of the minors and the State filed neglect petitions. Two days later, respondent waived her right to a shelter care hearing and the court granted DCFS temporary guardianship and custody of the minors.

¶ 7    Following the shelter care hearing, DCFS completed an integrated assessment and issued respondent a service plan for each minor. The integrated assessment revealed the following.

¶ 8    Respondent was born in Libya in 1986. Her primary language is Arabic, but she can converse in English. Respondent had five older brothers, all of whom died violently in Libya.

When respondent was six, she saw a car hit and kill her five-year-old sister. Respondent's last year of formal education was also when she was six years old.

¶ 9    When respondent was 12, she was forced into an arranged marriage with a 37-year-old man. Respondent's husband was physically and sexually abusive. He beat her with a wire and raped her if she disobeyed him. Because of the violence, respondent was allowed to divorce him nine months later. When respondent was 17, she married another man and had a daughter, H.A. Respondent was forced to divorce her husband, even though she loved him, because her father did not approve of him. When she was 19, she married another man, whom she described as "a good man." Respondent's first child with her new husband died in infancy. Respondent gave birth to a son, S.A., the following year.

¶ 10   Respondent found out that she was pregnant with R.B. on February 14, 2010. On February 17, 2010, respondent and her husband attempted to flee the escalating political violence in Libya. They attempted to pick up their son from respondent's mother's house but were unable to because of the militias. Respondent and her husband were forced into a refugee camp in Tunisia and respondent's husband was murdered at the camp's gates.

¶ 11   H.A. and S.A. remain with respondent's mother in Libya. Respondent has not seen them since 2010.

¶ 12   Respondent gave birth to R.B. at the camp in Tunisia in October 2011. Also, at the camp, respondent reunited with a male childhood friend, who became her paramour. He protected respondent and R.B. in the camp, which could often be a dangerous place. After arriving in the United States in 2015, respondent married her paramour, and they were resettled in the Midwest. After they were married, respondent's husband became possessive and abusive. Respondent and R.B. moved into a shelter, and respondent sought a divorce after two months of marriage.

Respondent's husband then began to "stalk" her, and even threatened to have her family killed in Libya. Respondent did not report this to the police because, in her experience, the authorities cannot be trusted. Instead, she set her husband's van on fire so he could not continue to follow her.

¶ 13    Respondent was initially charged with arson, but the charge was reduced to criminal damage to property and she was sentenced to probation. In addition, a neglect case (15-JA-399) was opened for R.B. (This case, too, was before Judge Martinez.) Respondent attended individual counseling and the case was successfully closed with R.B. returning to respondent's care in June 2016.

¶ 14    At some point, respondent began renting a two-bedroom home in the Rockford area. In 2017, respondent became pregnant with Y.A. Respondent reported that she drank liquor, almost daily, while she was pregnant with Y.A. because she was anxious and depressed. Due to a placental abruption, Y.A. was born eight weeks' premature, with a low birth weight. As a result of oxygen deprivation to the brain (perinatal anoxic ischemic brain injury) and a brain bleed (intraventricular hemorrhage), Y.A. suffers from seizures and muscle spasms. Y.A. also suffers from a heart defect (pulmonary artery stenosis). Y.A. was discharged from the hospital to his mother's care on January 4, 2018, and protective custody was taken twelve days later.

¶ 15    The integrated assessment also noted that respondent's discipline of R.B. was reportedly excessive and included striking R.B. with objects such as a broom, a wire, and a shoe. R.B. disclosed that she loved her mother, but was afraid of her. R.B. reported that her mother would drink vodka and beer excessively and pass out at home as well as behind the wheel of her car.

¶ 16    As a result of the foregoing, respondent's February 2018 service plan goals included weekly supervised visitation, remaining drug and alcohol free, participating in a substance abuse assessment (and following through with its recommendations), participating in individual

counseling, participating in parent/child psychotherapy and relationship building with R.B., participating in parenting education, and compliance with all legal requirements.

¶ 17    In May 2018, the State filed amended neglect petitions and respondent stipulated to the allegation of failure to provide adequate care. See 705 ILCS 405/2-3(1)(a) (West 2018). Respondent further stipulated that she was dispositionally unfit, unwilling, or unable to care for the children. The court adjudicated the children neglected and made them wards of the court. The court also ordered guardianship and custody to DCFS's administrator. In addition, the children would be supervised by Children's Home and Aid Society of Illinois (CHASI), an agency under contract with DCFS.

¶ 18    After hearing evidence at the first permanency hearing on November 30, 2018, the trial court found that respondent had made reasonable efforts, but not reasonable progress. The court noted reports that respondent often displayed inappropriate behavior during supervised visits with the children, which caused R.B. to be fearful of visits with her mother. In addition, respondent had not stayed sober. The court stated that "she's trying, but she's got a long way to go." The court found that the children's permanency goal should be to return home within 12 months, or October 2019.

¶ 19    After a second permanency hearing on April 11, 2019, the court noted that respondent had completed intensive outpatient treatment and had behaved appropriately during supervised visits with the children. Respondent also reported that she was pregnant and due in November, but was not in a relationship with that child's father. R.B. was doing well in school and recently had expressed that she enjoyed visits with respondent. With respect to Y.A., however, the news was not positive. Y.A. was also diagnosed with fetal alcohol syndrome. Based upon MRI results and due to the many strokes and seizures he suffered, the parties recently learned that Y.A. had cerebral

palsy. He would likely never walk or talk. The parties stipulated that respondent made reasonable efforts and reasonable progress during this time period, and the goal remained for the children to return home in October.

¶ 20    In August 2019, DCFS submitted a report to the court noting that respondent had relapsed and began drinking following Y.A.'s diagnosis and had relapsed at least twice. Visits with the children at respondent's home also had not gone well. Respondent was again admitted to intensive outpatient therapy. Respondent still had not entered a parenting class and had not begun parent-child therapy with R.B.

¶ 21    At the permanency review on September 10, 2019, the court found that respondent had made reasonable efforts but not reasonable progress because of her alcohol abuse. The court continued to believe a permanency goal of 12 months was appropriate, but for a new 12-month period to begin. The court stated its concerns that R.B. was still anxious and afraid of her mother and that Y.A. had significant medical needs that respondent might not fully appreciate.

¶ 22    As it will become relevant for unfitness, we note that the State's termination petition ultimately alleged that respondent failed to make reasonable progress towards the children's return to her care within two specified nine-month periods: (1) September 10, 2019, through June 9, 2020, and (2) March 11, 2020, through December 10, 2020. See 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 23    In October 2019, respondent gave birth to a baby boy, R.A. The baby was born premature, but was healthy. In February 2020, DCFS filed another service plan and progress report with the court. The report noted that respondent had been alcohol-free since her last relapse and had consistently attended AA meetings. However, respondent had not attended Y.A.'s healthcare appointments—at the time, he saw an orthopedist, a cardiologist, a neurologist, and attended weekly occupational and physical therapy sessions; her failure to participate in these appointments

indicated that respondent would require "intensive education" before Y.A. could be returned to her care. In addition, R.B. remained fearful of her mother and it appeared that respondent refused to accept responsibility for R.B.'s trauma. Respondent also failed to participate in parent-child therapy with R.B. and Y.A. As such, respondent received unsatisfactory ratings in several areas of her service plan.

¶ 24    Another permanency report was filed with the court in February 2020. This report indicated that respondent had made some progress; however, due to Y.A. being hospitalized, visits with him were canceled. Respondent was due to transition to unsupervised and overnight visits with R.B. A permanency hearing was held which revealed that respondent had missed several of Y.A.'s doctors' appointments, but she had indicated that she had not known about them. The court noted that respondent still had not engaged in parent-child therapy with R.B. The court found that respondent had made reasonable efforts with respect to both children, but had not made reasonable progress with respect to Y.A. The court also deferred its progress determination as to R.B. pending additional reports.

¶ 25    On July 9, 2020, the court held another permanency hearing. A report to the court noted that on June 18, 2020, respondent was involved in a significant car accident. Respondent drove her car into a building and was arrested for DUI (625 ILCs 5/11-501(a)(2) (West 2018)), aggravated battery to a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2018)), resisting arrest (720 ILCs 5/31-1(a) (West 2018)), and multiple traffic violations. Respondent's blood alcohol content

(BAC) was reported as .319.[1] Respondent denied that she had been drinking that night. She stated that she was on her way to pick up R.A. from daycare. DCFS then took protective custody of R.A.

¶ 26    On June 22, 2020, a shelter care hearing was held for R.A. After the hearing, respondent repeatedly called caseworker Megan Leber and repeatedly stated that she was going to kill herself. Leber called the police, who performed a wellbeing check and determined that respondent was stable. Two days later, respondent repeatedly called her and R.B.'s counselor and again threatened to kill herself. This resulted in another wellbeing check.

¶ 27    R.B. reported that she was aware of her mother's relapse as she had spent more time with respondent on video visits due to the COVID-19 pandemic. R.B. was doing well in school and had been placed in the same foster home as Y.A. R.B. was reportedly "struggling" with her mother's accident and relapse.

¶ 28    The trial court noted that prior to her arrest, respondent had made at least some strides. The court found that respondent had made reasonable efforts but not reasonable progress. The court stated that it was reluctant to change the children's permanency goals from return home now that an additional sibling was court involved. The court stated that it did not want to "set siblings on different tracks at least at this point." The court cautioned respondent, however, that it would not hesitate to order a goal change if respondent failed to make progress by the next hearing.

¶ 29    On December 10, 2020, another permanency hearing was held. In a report to the court, respondent admitted that she and a friend drank a "skull" of vodka before her accident. Respondent reentered intensive outpatient treatment again in July 2020 and was successfully discharged in

---

1 At several points in the record, respondent's BAC was reported as .379 instead of .319. We will give respondent the benefit of the doubt and use the lower number.

September 2020. On October 7, 2020, however, respondent tested positive for alcohol; however, she denied drinking. Two days later, respondent called another counselor at CHASI and threatened suicide. The police were unable to locate respondent. The following day, caseworker Leber found respondent who denied drinking and said she was just having a bad day.

¶ 30    Respondent presented herself for a visit with R.B. on November 20, 2020, but according to R.B. and Leber, respondent appeared intoxicated. Her speech was slurred and she was erratic. The following week's visit was conducted over video, and R.B. repeatedly questioned her mother about her alcohol use the week before. Respondent repeatedly denied drinking and R.B. became upset causing workers to terminate the visit.

¶ 31    The trial court found that respondent had not made reasonable efforts or reasonable progress during this period. The court further found that reunification was unlikely and changed the children's goal to substitute care pending the termination of parental rights.

¶ 32    In February 2021, the State filed petitions to terminate respondent's parental rights. As noted above, the petitions alleged respondent failed to make reasonable progress towards the children's return to her care within two nine-month periods: (1) September 10, 2019, through June 9, 2020, and (2) March 11, 2020, through December 10, 2020. See 750 ILCS 50/1(D)(m)(ii) (West 2018). The petitions also alleged that respondent failed to protect R.B. and Y.A. from conditions in their environment that were injurious to their welfare. See *id*. § 1(D)(g).

¶ 33    On May 4, 2021, an unfitness hearing was held. Caseworker Leber testified that she had been the children's caseworker since the fall of 2018. Leber recounted how the case came into care because respondent sent R.B. out at night to the school bus and had left Y.A. at a garage. Leber recounted the information contained in the integrated assessment as well as the grades in

respondent's service plans. Specifically, Leber noted that respondent had not completed all of the goals in her July 2019 and January 2020 service plans, which were overall unsatisfactory.

¶ 34    Leber also testified about respondent's multiple repeated calls to service personnel, threatening suicide, and respondent's accident and arrest. Leber also described an incident where respondent appeared to be intoxicated and was "screaming and throwing things out of her car at agency workers." Leber also noted respondent's confirmed relapses in April 2019, August 2019, and June 2020.

¶ 35    Leber explained that respondent had complex needs regarding her mental health and substance abuse. Furthermore, Leber assessed that respondent was unable or unwilling to appreciate the impact of her unstable behavior has on R.B. Leber also described Y.A.'s complex medical needs and stated respondent seemingly was unable or unwilling to appreciate their severity. According to Leber, Y.A. required constant care and that any gap in his treatment could quickly become life threatening.

¶ 36    Respondent testified that while she had missed drug and alcohol drops at certain times, she denied having relapsed following August 2019. She denied ever calling R.B. " 'stupid,' " but conceded that had called R.B. "other stuff." Respondent also stated that she could not make it to Y.A.'s doctors' appointments because she was working at a factory job in Beloit, Wisconsin. On cross-examination, respondent testified that she had worked in Wisconsin for "[a]bout nine months" in 2019. Respondent stated that she had nothing further to tell the court.

¶ 37    The trial court found that the State failed to prove the injurious-environment allegation, as the children's environment had largely been their foster homes for the preceding three years. However, the court found respondent unfit for failure to make reasonable progress during both specified nine-month periods for both children. The court noted that respondent's relapses seemed

to derail her progress, causing her to engage in unstable and harmful behavior. The court noted that these were precisely the same conditions that were the basis for the children's removal, which respondent failed to correct.

¶ 38    At a best interests hearing, Leber testified that R.B., now nine, was successfully placed in the same foster home as Y.A., who was now three. (R.A., who is not the subject of this appeal, was also placed with his siblings.) Leber explained that Y.A. has been with his foster parents for three years and that his foster parents attend all of his appointments and tend to all of his needs. Y.A.'s foster parents created a binder and kept track of all of Y.A.'s hospitalizations, doctor's visits, diagnoses, medications, and other treatment. R.B. was reportedly doing well in school and enjoys her extracurricular activities such as bowling, Girl Scouts, and art therapy. The children's foster parents have many relatives and the children are well integrated into the family. The children's foster parents are committed to adopting the children.

¶ 39    Respondent testified that her last relapse was in October 2020. Respondent said that she did everything that was asked of her and did not know why she could not have her children back.

¶ 40    The trial court found that it was in R.B.'s and Y.A.'s best interests to terminate respondent's parental rights. Respondent appeals.

¶ 41                                II. ANALYSIS

¶ 42    On appeal, respondent challenges the trial court's unfitness and best interests findings. We affirm.

¶ 43    At any time after the entry of the dispositional order, the State may file a petition requesting termination of parental rights. 705 ILCS 405/2-13(4) (West 2012); *In re Brandon A.*, 395 Ill. App. 3d 224, 234, 334 (2009). Thereafter, the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) provides for the termination of parental rights in a two-step process. "First, there

must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998))." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). After finding the parent unfit, the court next considers whether it is in the best interests of the child to terminate parental rights. *Id.* We will reverse an unfitness or best interests finding if and only if the trial court's determination was against the manifest weight of the evidence, *i.e.*, if the opposite conclusion was clearly apparent. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 17.

¶ 44    Here, as the State notes, respondent was found unfit on four grounds, meaning that she was found unfit in relation to two separate (albeit, overlapping) nine-month periods as to each child. In addition, as the State also notes, we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period. *In re J.L.*, 236 Ill. 2d 329, 340 (2010); see also *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006); *In re C.W.*, 199 Ill. 2d 198, 210 (2002) (any one ground, properly proven, is sufficient to enter a finding of parental unfitness).

¶ 45    Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the child, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if her actions during that period indicate that the court will be able to order that the child be returned home in the "near future." See *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. Conversely, a failure to make reasonable progress includes the parent's failure to substantially fulfill his or her obligations under the service plan. *Id*.

¶ 46    We agree with the trial court that respondent failed to make reasonable progress during the first nine-month period, which ran from September 10, 2019, through June 9, 2020. Respondent's February 2020 service plan rated her as unsatisfactory for her participation in parent-child therapy.

While it was noted that R.B. was fearful of respondent, and so was often reluctant to communicate in therapy, counselors noted that their larger concern was respondent's lack of empathy toward R.B. as well as respondent's unwillingness to accept responsibility for R.B.'s emotional trauma. In addition, respondent was rated unsatisfactory for failing to attend many of Y.A.'s doctors' appointments. One of Y.A.'s therapists reported that when respondent did attend, she was often combative with Y.A.'s foster parents, which in turn impeded Y.A.'s progress by interfering with his medical treatment.

¶ 47    We note that, by this point, the children's case had been pending for 2½ years, and respondent still had not progressed to unsupervised visitation. The record indicates that by the end of this period—June 9, 2020—there was no reason to believe that the children could be returned to respondent's care and custody in the near future. The State's evidence clearly and convincingly showed that respondent was unwilling or unable to form a healthy emotional bond with R.B. and was unwilling or unable to appreciate the complexity of Y.A.'s daily medical needs. Accordingly, we agree with the trial court that respondent objectively failed to make reasonable progress with either child within this nine-month period.

¶ 48    Although we need not discuss unfitness further (see *In re C.W.*, 199 Ill. 2d at 210) we note that during the second period—March 11, 2020, through December 10, 2020—matters failed to improve. Respondent's car accident was on June 18, 2020, and despite her repeated claims that she was not intoxicated, respondent's BAC was a .319, or roughly four times the legal limit. Respondent also struck a police officer and was charged with a felony. (Respondent's criminal cases had not yet been resolved by the time of her unfitness hearing.) Like the trial court, we too are alarmed at respondent's high BAC and her initial refusal to admit to drinking that night. And, like the trial court, we too have grave concerns that respondent stated that she was on her way to

pick up R.A. from daycare in such condition. While we are thankful that respondent was not seriously injured in the accident, the fact remains that this episode, and respondent's attempts to minimize it, preceded DCFS taking protective custody of R.A. and permanency goal changes for R.B. and Y.A.

¶ 49    In addition, during this second period, respondent repeatedly harassed caseworkers with multiple phone calls and threatened suicide. Respondent also refused further outpatient substance abuse treatment during this time. Respondent's December 2020 service plan rated her unsatisfactory for remaining sober during the preceding six months, as she missed at least three drug and alcohol drops, which were rated positive.

¶ 50    It was clear during this time period that respondent continued to use alcohol and failed to cooperate with caseworkers. Accordingly, we agree with the trial court that respondent failed to make reasonable progress during this period too, as there was no reason to believe the children could be returned to respondent's care in the near future. See *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7.

¶ 51    Having affirmed the trial court's unfitness findings, we now turn to best interests. Once a trial court has found a parent unfit, considerations regarding parental rights yield to the best interest of the child. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 42. The court must consider a number of statutory factors in the context of the child's age and developmental needs, including physical safety and welfare, familial and community ties, and the least disruptive placement. 705 ILCS 405/1-3(4.05)(a-j) (West 2018). The trial court's decision on best interest is also reviewed under the manifest-weight standard. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 52    In its best interests decision, the trial court noted that the "children are in a home that they identify as their family." They have a "strong[ ] bond[ ]" with their foster parents and their foster

parents' extended family. As important, the children are "[v]ery well taken care of" and their foster parents are "prepared to meet their needs."

¶ 53    After careful review of the record, we agree with the court's assessment. The whole of the record indicates that the children's safety and welfare is secure with their foster family as the children had been in their foster placement for nearly three years. The children's foster parents were well attuned to R.B.'s emotional needs and Y.A.'s medical needs. In short, nearly every best interest factor favored the termination of respondent's parental rights.

¶ 54    Before concluding, there is one final matter we must address. Respondent's counsel filed an opening appellate brief in this court that was a mere 11 pages, double spaced. We are not so much concerned with the length of counsel's brief as we are with its content. Counsel's four-page statement of facts elides *many* critical events and details in this case. Counsel's argument section fares no better. It is replete with boilerplate and a number of statements that are, *at best*, only partially true. For example, counsel refers to respondent's accident as a "slip up," and attempts to minimize her conduct by saying that she lacks "perfect coping mechanisms." Counsel also stated that, respondent was "on the cusp of being able to fully parent her children" and suggests that the COVID-19 pandemic was responsible for an increase in respondent's alcohol consumption, rather than respondent herself. In addition to being far too glib, these statements are disingenuous; they fail to accurately recite the facts of case and are *not* well taken. Cases involving the termination of parental rights are some of the most serious and sensitive matters a court can hear. They demand the utmost professionalism and care from counsel. This panel strongly considered issuing a rule to show cause and holding counsel in contempt. We remind counsel of his duty of candor to this court and every other tribunal (see Ill. R. Prof'l Conduct, R. 3.3(a)(1)(eff. Jan. 1, 2010)), and trust that we shall *not* have cause to remind him again in the future.

¶ 55                              III. CONCLUSION

¶ 56    In sum, although we are mindful of respondent's traumatic early life in Libya and a chaotic relocation to the United States as a refugee, our task here is to review the evidence of her relationship with and care of her children, as well as to apply that evidence to the various statutory factors when reviewing the best interests of the children. Undertaking this responsibility seriously, we affirm the judgment circuit court of Winnebago County finding respondent unfit and terminating her parental rights.

¶ 57    Affirmed.